**Erik J. GINYARD, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 98–CF–1793, 00–CO–615.**

District of Columbia Court of Appeals.

Argued March 20, 2001.
Decided Feb. 6, 2003.

personal representative for his delay in seek- ing the appointment of a special master.

Deborah A. Persico, appointed by the court, for appellant.

Rhonda T. Redwood, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman and Diana Harris Epps, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, FARRELL, and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Appellant Erik J. Ginyard was indicted along with Ricardo Curtis for the shooting of Laffette Copeland. The theory underlying the indictment was that Curtis furnished the gun with which Ginyard fired the shots. Before trial, Curtis pleaded guilty to a single count of carrying a pistol without a license in exchange for the dismissal of the other counts against him. As part of his plea agreement, Curtis agreed to testify against Ginyard. At Ginyard's trial, however, the government found itself unable to present Curtis's testimony when the court upheld his unexpected invocation of his Fifth Amendment privilege against self-incrimination. Despite not hearing from Curtis, the jury found Ginyard guilty of assault with intent to murder while armed, aggravated assault while armed, two counts of possession of a firearm during the commission of a crime of violence or dangerous offense, and related weapons offenses. Ginyard appealed his convictions. He also filed a motion in the trial court pursuant to D.C.Code § 23–110 to set aside his convictions for ineffective assistance of counsel, based on his counsel's decision not to present certain potentially exculpatory witnesses at his trial. The court denied that motion without a hearing. Ginyard appealed from that denial. The two appeals have been consolidated in this court.

With one exception, we reject Ginyard's contentions on appeal. We hold that Ginyard was not denied his Sixth Amendment right of confrontation when the government failed to produce Curtis as a witness after having summarized his expected testimony in its opening statement. We also hold that the trial court did not abuse its discretion in denying Ginyard a mistrial for prosecutorial misconduct. We reject Ginyard's claim that the government infringed his Fifth Amendment right to due process by not disclosing allegedly exculpatory evidence to him before trial, namely the fact that Curtis denied handing any weapon directly to Ginyard. We also reject Ginyard's contention that the trial court violated his Fifth and Sixth Amendment rights when it upheld Curtis's assertion of his privilege against self-incrimination without requiring the government to grant Curtis use immunity. We agree with Ginyard that his two convictions for possession of a firearm during a crime of violence merge, but reject his argument that his convictions for aggravated assault and assault with intent to commit murder merge. Finally, we hold that the trial court did not err in denying Ginyard's post-conviction claims of ineffective assistance of counsel without an evidentiary hearing. Accordingly, we affirm Ginyard's convictions and remand for resentencing.

## I.

The issue for the jury in this case was whether it was Ginyard or Curtis who shot Laffette Copeland. Copeland himself was positive that it was Ginyard, whom he

knew. Copeland told the police immediately after the attack that "Erik" shot him. Copeland confirmed that Ginyard was the shooter when the police showed him a photographic array containing Ginyard's picture. At trial, Copeland identified Ginyard unequivocally and flatly denied that it was Curtis who shot him. Although he admittedly had told Ginyard's mother, defense counsel, and defense investigator that Ginyard was not his assailant, Copeland explained at trial that he made that statement only because he was afraid to tell them the truth.

According to Copeland, Ginyard held a grudge against him following a quarrel with Copeland's uncle. On the day of the shooting, Ginyard and his friends Anton Parker and Vernon followed Copeland down the street and threatened him until he ducked inside a friend's house to get away from them. Later that day, Copeland went to visit Nathan Coppedge, who was friends with both Copeland and Ginyard. Copeland and Coppedge were standing in the yard outside Coppedge's house when Ginyard and Parker appeared along with a crowd of some twenty people. Copeland testified that while Parker spoke with him about ending their dispute, Ginyard stood apart and taunted him. Copeland shook hands with Parker and ignored Ginyard's taunts. Then Copeland noticed Ricardo Curtis come around the corner and walk over to Ginyard. Curtis had a gun in his right pocket. Ginyard leaned back and whispered something to someone in the crowd. Copeland could not say who it was that Ginyard addressed. Ginyard then turned back around. Now Ginyard was holding a gun. He pointed the gun at Copeland and started shooting. As Copeland fell to the ground, wounded in the wrist, back and stomach, he saw Ginyard and Curtis run away together.

Copeland did not testify that he saw Curtis give his gun to Ginyard. A police detective testified, however, that Copeland identified Curtis from his photograph three months after the shooting as "the person that passed Erik the gun to shoot me with."

The theory of the defense was that Copeland's assailant was Curtis, not Ginyard. A police officer who testified in the government's case-in-chief reported that several eyewitnesses whom he knew to be friends of Ginyard told him that Ginyard was not the shooter. A detective testified that Ginyard himself spoke with him after the shooting and said that he and Parker were settling their dispute with Copeland when somebody dressed in black came from nowhere, shot Copeland, and ran off. Ginyard himself did not testify at his trial, but the defense called three eyewitnesses—Parker, Coppedge and Coppedge's girlfriend Tenisha Monroe—who testified that Ginyard did not shoot Copeland. Coppedge said that he recognized the shooter to be Curtis, while Parker and Monroe said they could not identify the shooter because he covered his face with a black t-shirt.

In convicting Ginyard, the jury evidently credited Copeland's identification of Ginyard over the contrary evidence.

## II.

### A.

The theme of Ginyard's direct appeal is that the trial court violated his Fifth and Sixth Amendment rights and abused its discretion in permitting his prosecution to proceed as it did without the testimony of Ricardo Curtis. Ginyard's contentions focus on the government's opening statement, which summarized Curtis's expected testimony; Curtis's subsequent assertion of his privilege against self-incrimination;

the government's failure to disclose Curtis's testimony to Ginyard before trial; and the government's decision not to immunize Curtis and call him as its witness.

In her opening statement, counsel for the government summarized the testimony she expected to present from Ricardo Curtis. She said only that Curtis had tried to give Ginyard a gun at various times during the day of the shooting and that Curtis had been thwarted one of those times by the presence of Ginyard's mother. Nonetheless, the prosecutor obliquely concluded, "the person who was wanting this weapon that was used in the shooting was Mr. Ginyard"—implying that Curtis ultimately succeeded in getting the weapon into Ginyard's hands.

Ginyard's opening statement previewed evidence expected to show that Curtis was the shooter. In his summary of this evidence, Ginyard's counsel proffered that after Curtis was indicted, he wrote a letter asking a friend to "take care" of Copeland before Copeland could testify against him. The fortuitous discovery of this incriminating letter during the execution of an unrelated search warrant led the police to open an investigation of Curtis for obstruction of justice. A police handwriting examiner concluded that Curtis wrote the letter despite Curtis's attempt to fool the examiner by altering his writing style in the handwriting samples he submitted. Informed of the examiner's conclusion, Curtis agreed to plead guilty to carrying a pistol without a license in exchange for the dismissal of "every other single charge that was pending against him." His deal with the government required Curtis to testify against Ginyard, "and that's why," defense counsel concluded, "we'll see him in court sometime next week."

This prediction did not come to pass. On the third day of trial, Curtis's attorney appeared in court and advised that his client would assert his Fifth Amendment privilege against self-incrimination in response to any questions he might be asked about the letter he allegedly had written. The attorney explained that the government had not agreed to drop the potential charge of obstruction of justice that was based on the letter, and that Curtis had not waived his privilege with respect to that charge when he pled guilty to carrying a pistol without a license. The government agreed that the obstruction charge was not covered by the plea agreement and that Curtis retained a Fifth Amendment privilege not to answer questions about the incriminating letter.

Although counsel for the government stated that she did not intend to ask Curtis about the letter, the trial court agreed with Ginyard's counsel that the document would be a proper subject of cross-examination to impeach Curtis's credibility. Concluding that the government could not benefit from Curtis's testimony on direct if he could not be examined about the letter on cross, the court ruled that the government could not call Curtis as a witness unless it first immunized him from prosecution for obstruction of justice in connection with the letter. The government acquiesced in the court's ruling and elected to forego Curtis's testimony.

Ginyard then moved for a mistrial, claiming that he was prejudiced by the government's summarization of Curtis's testimony in its opening statement. Ginyard argued that the government should have known that Curtis would assert his Fifth Amendment privilege and not testify. The court deemed a mistrial unwarranted. It found that the government had not proceeded in bad faith and concluded that it could negate any adverse inferences from the failure of either party to call Curtis by instructing the jury that he was unavailable to testify. Ginyard asked the court to

tell the jury that Curtis was unavailable because he had asserted his privilege against self-incrimination, which the government opposed and the court refused to do.

The following day, Ginyard renewed his objections to the government's opening statement. In the colloquy that ensued, the government proffered that if Curtis had testified, he would have said only that he attempted to give his gun to Ginyard on the day of the shooting but eventually gave it instead to Ginyard's friend Vernon. Although Curtis believed that Vernon passed the gun on to Ginyard, he did not see Vernon do so. Curtis claimed that he did not see Ginyard shoot Copeland either and so could not say what gun he used. Vernon himself was not a government witness, and the government conceded that it had no witness who could confirm that Curtis supplied Ginyard with a gun.

In light of this proffer, the court deemed it a close question whether the government had a sufficient basis to say in its opening statement that Ginyard used Curtis's gun to shoot Copeland. Assuming *arguendo* that the government's opening statement was improper for lack of a sufficient foundation, the court nonetheless declined to declare a mistrial. Rather, the court decided that it would instruct the jury specifically to disregard anything said in the opening statements about what Curtis's testimony would have been.

In addition to renewing his claim that the government's opening statement was improper, Ginyard advanced two other contentions. First, Ginyard claimed that the government had committed a *Brady*[1] violation by not informing him before trial that Curtis said he gave his gun to Vernon. Ginyard argued that if he had been told that before trial, he might have called Vernon as a witness to contradict Curtis and testify that he did not receive a gun from him. Ginyard's counsel acknowledged, however, that he had not talked with Vernon and did not know what Vernon would say. The court refused to halt the proceedings but said it would consider granting a motion for a new trial if Ginyard could proffer that Vernon did have helpful testimony to give. (Ginyard did not include such a proffer in the new trial motion that he subsequently made.)

Second, Ginyard objected to the trial court's determination that Curtis had a valid Fifth Amendment privilege. Stating that the government had told him some months earlier that Curtis had admitted writing the incriminating letter, which the government did not deny, Ginyard's counsel argued that Curtis had waived his Fifth Amendment privilege with respect to the letter. Unpersuaded by this contention, the court pointed out that Ginyard had no right to require the government to call Curtis as its witness or to resist Curtis's assertion of his Fifth Amendment privilege.

The government did not mention Curtis in its closing arguments. Ginyard's counsel commented that Curtis "ha[d] become unavailable now . . . [and] didn't come in to respond" to the testimony that he was the shooter, even though the government had "promised" the jury it would hear from Curtis. The court instructed the jury not to consider what counsel had said in their opening statements about Curtis's anticipated testimony because the opening statements were not evidence and Curtis was "unavailable to be called as a witness by either side in this case."

### B.

Ginyard contends that he was denied his Sixth Amendment right to confront the

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

witnesses against him because he was unable to cross-examine Curtis after the government previewed his testimony in its opening statement. Ginyard further contends that the government proceeded in bad faith when it implied that Curtis would say he gave his gun to Ginyard, because it knew or had reason to know both that Curtis would invoke his Fifth Amendment privilege and not testify and that if Curtis did testify he would say only that he gave his gun to Vernon. Ginyard argues that the government's misleading forecast of Curtis's testimony lent critical support to Copeland's otherwise uncorroborated identification of Ginyard as his assailant. Emphasizing that his trial lasted only a few days, Ginyard further argues that the government's summary of Curtis's testimony was still fresh in the jurors' minds when they retired to deliberate, and that the court's instruction to the jury not to consider it could not nullify its prejudicial impact.

 Forcefully as Ginyard presses these arguments, he does not persuade us that the trial court abused its discretion in denying his motion for a mistrial. Rather, guided by binding precedent, we hold that the trial court's limiting instruction to the jury properly and adequately protected Ginyard's rights.

The Supreme Court confronted a situation much like the one before us now in *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). After the prosecutor in that case had described in his opening statement the testimony he expected to present from a co-defendant who had pled guilty, the co-defendant asserted his privilege against self-incrimination and refused to answer any questions. The trial court instructed the jury not to consider the prosecutor's opening statement as evidence. The Supreme Court held that this instruction sufficed to pro-

tect the defendant's Sixth Amendment rights:

> It may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable. But here we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce. Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance. Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given. Even if it is unreasonable to assume that a jury can disregard a co-conspirator's statement when introduced against one of two joint defendants, it does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial. At least where the anticipated, and unproduced, evidence is not touted to the jury as a crucial part of the prosecution's case, "it is hard for us to imagine that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately."

*Frazier*, 394 U.S. at 736, 89 S.Ct. 1420 (quoting *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)). The Court added that "the prosecutor's good faith, or lack of it," in expecting that the co-defendant would testify, was not "controlling" in determining whether the defendant was deprived of his constitutional rights. *Id.*

Comparable situations presented themselves to this court in *Burkley v. United States*, 373 A.2d 878 (D.C.1977), and *Walk-*

*er v. United States,* 630 A.2d 658 (D.C. 1993). In *Burkley,* after the prosecutor said in his opening that a convicted accomplice would implicate the defendant, the accomplice refused to testify. Following *Frazier,* we held that the trial court adequately protected the defendant's confrontation rights by instructing the jury not to consider the prosecutor's opening remarks. "We presume," we said,

> unless the contrary appears, that the jury understood and followed the court's instructions.... Here, there was nothing to suggest that the jury did not comprehend and respect the admonitions of the trial court.

373 A.2d at 881 (citation omitted). Similarly, in *Walker,* the government said in its opening statement that a certain witness would testify that the defendant had admitted that he committed the offense for which he was on trial. When the witness, who was under subpoena, did not appear for trial, the defendant moved for a mistrial on the ground that the government failed to substantiate the representation it had made in its opening. We held that the trial court did not abuse its discretion in denying a mistrial, as there was no bad faith on the part of the government, the government's case otherwise was strong, and any possible prejudice was cured by the court's instruction to the jury that the opening statements were not evidence. As a general rule, we observed, " '[t]he law does not require that the opening trial statements be completely supported by evidence introduced during the trial.... [and] the failure to sustain all opening remarks during the trial is not automatically ground for a new trial.' " 630 A.2d at 667 (quoting *Robinson v. United States,* 361 A.2d 199, 200 (D.C.1976)).

The facts of the present case do not call for a departure from *Frazier, Burkley* and *Walker.* In its opening statement, the government referred to Curtis's anticipated testimony only briefly, and rather opaquely at that. In its closing arguments the government did not refer to Curtis at all. Unquestionably, Curtis's testimony was "not touted to the jury as a crucial part of the prosecution's case." *Frazier,* 394 U.S. at 736, 89 S.Ct. 1420. Nor did the government improperly ask the jury to draw adverse inferences from Curtis's assertion of his Fifth Amendment privilege (which the jury did not even know about). *Cf. Namet v. United States,* 373 U.S. 179, 186–87, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). The trial court gave a proper limiting instruction to the jury—a more specific instruction, indeed, than that given the jury in *Frazier*—and as in *Burkley* we see no reason to think that the instruction was inadequate or that the jury disregarded it. We think it fanciful for Ginyard to suggest, as he does in his brief, that the instruction implied that he knew in advance of trial that Curtis would not testify and that he was at fault for commenting about Curtis's expected testimony in his opening. We perceive no such implications. The court wisely refused Ginyard's request to instruct the jury that Curtis had asserted his privilege against self-incrimination. That instruction only would have encouraged the jury to draw unwarranted inferences, such as that Curtis had owned up to shooting Copeland himself.

 We are unpersuaded by Ginyard's claim of prosecutorial misconduct. To be sure, "[i]t is unprofessional conduct for counsel to 'allude [in his opening statement] to any evidence unless there is a good faith and reasonable basis for believing [that] such evidence will be tendered and admitted.' " *Frederick v. United States,* 741 A.2d 427, 440–41 n. 25 (D.C. 1999) (quoting ABA STANDARDS FOR CRIMINAL JUSTICE 7.4 (The Defense Function) (1993)). It might have been

foreseeable that Curtis would assert a Fifth Amendment privilege at Ginyard's trial, given that the government had not agreed to forego prosecuting him for obstruction of justice in connection with the incriminating letter he allegedly wrote. But such foreseeability is not the measure of bad faith. Curtis had promised to testify against Ginyard as part of his plea agreement. When he made that promise, Curtis was represented by counsel, and both he and his counsel knew that he remained subject to a potential obstruction charge. The facts underlying that charge were not the subject of Ginyard's trial or the government's intended examination of Curtis. It was not until three days into that trial that Curtis's counsel informed the government that he would assert a privilege if he was questioned about the letter. The trial court found that the government had a reasonable belief up until that time that Curtis would testify. The record supports that finding.[2]

Nor did the prosecutor in this case display bad faith when she said in her opening statement that "the person who was wanting *this weapon that was used in the shooting* was Mr. Ginyard" (emphasis added). It is true that although the italicized portion of the quoted statement implied, at least to those who listened with a sharp ear, that Curtis succeeded in conveying his gun to Ginyard, the government subsequently conceded that it had no direct proof of that fact. (The government did not rely on Copeland's out-of-court statement to a detective that Curtis passed the gun to Ginyard, perhaps because the de-

tective did not state how Copeland arrived at that conclusion.) Like the trial court, we think it debatable whether the evidence in its entirety permitted an inference that a gun did go from Curtis to Ginyard, directly or indirectly. That may depend on what exactly Curtis would have said had he testified. But the question is close enough that even if the prosecutor should not have drawn the inference she seemingly did, her lapse in reasoning did not manifest bad faith on her part.

In sum, Ginyard was not deprived of his Sixth Amendment right of confrontation, and the trial court did not abuse its discretion in denying his motion for a mistrial.

### C.

Invoking *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Ginyard next contends that the government breached its constitutional duty to disclose evidence materially favorable to the defense by not informing him prior to trial that Curtis said he gave his gun to Vernon rather than directly to Ginyard. Ginyard argues that this information was "critical to the defense because it directly contradicted the testimony of the government's lead witness, Copeland, who claimed that he saw Ricardo Curtis directly hand a gun to appellant." Ginyard claims that if the government had given him this information before trial, he could have impeached Copeland's credibility by (1) cross-examining Copeland about "his claim that Curtis directly handed a gun to [him]," (2) locating and subpoenaing Vernon to testify,[3] or (3) calling Curtis as a

2. At one point in his brief, Ginyard accuses the government of intentionally causing Curtis to assert the Fifth Amendment privilege for its own tactical advantage by dangling a threat of prosecution for obstruction of justice when it recognized that Curtis's testimony would help the defense. The record is devoid of evidence to justify that accusation.

3. Although Ginyard's argument assumes that Vernon would have acknowledged receiving a gun from Curtis, there is nothing in the record to support that assumption—let alone the implicit additional assumption that Vernon would not have said that he passed the gun on to Ginyard, as Curtis believed he did. It might be surmised that Vernon would have

defense witness to testify that he did not give a gun directly to Ginyard.

■ At trial Ginyard offered a different rationale for his *Brady* claim, namely that he could have called Vernon to contradict Curtis by saying that Curtis did not give him any gun. Ginyard has abandoned this rationale on appeal (for good reason; such hypothesized testimony by Vernon could not have helped Ginyard in the slightest, inasmuch as the government did not call Curtis to the witness stand). Although parties are not limited on appeal to the precise arguments they made below, *see Salmon v. United States*, 719 A.2d 949, 953 (D.C.1997), the disparity here is striking. It is arguable, therefore, that we should review Ginyard's *Brady* claim for plain error only, though the government has not urged us to do so. We need not decide that question, however. Even assuming that Ginyard is entitled to plenary review, his *Brady* claim fails.

■ In *Brady* the Supreme Court announced the government's constitutional duty to disclose material evidence favorable to a criminal defendant in time for the defendant to make effective use of it at trial. This duty extends to evidence that could be used to impeach the credibility of a government witness. *See Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Favorable evidence is material under *Brady*, such that its suppression by the government will require reversal of a conviction, if a "reasonable probability" exists that it would have produced a different verdict. *Strickler v. Greene*, 527 U.S. 263, 281, 119

S.Ct. 1936, 144 L.Ed.2d 286 (1999). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). The burden is on the defendant to establish such a reasonable probability. *Strickler*, 527 U.S. at 291, 119 S.Ct. 1936 . Imprecise as the standard may be, a "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

■ The trial court saw no reasonable probability that pretrial disclosure of Curtis's testimony would have been helpful to Ginyard, and even without according special deference to the trial court's assessment,[4] we agree that Ginyard has not shown such a likelihood. Contrary to the premise of Ginyard's argument, Copeland did not testify that he saw Curtis "directly hand" a gun to Ginyard. Copeland said nothing about Curtis handing the gun he was carrying to anyone and nothing about how, or from whom, Ginyard obtained the gun he wielded. Copeland did not say that Ginyard even spoke with Curtis. Thus evidence that Curtis handed his gun to Vernon would have been consistent with Copeland's testimony and would not have undermined his credibility.[5] Nor is it like-

---

been much more likely either to assert a Fifth Amendment privilege not to testify or to claim that he did not receive any weapon from anyone; but we will not speculate.

**4.** *See Farley v. United States*, 767 A.2d 225, 228–29 (D.C.2001) (leaving open the issue of whether appellate review is limited to deter-

mining whether the trial court's decision on materiality was "reasonable").

**5.** It is true that a detective testified that Copeland told him that Curtis passed the gun to Ginyard. The significance of that assertion— whether Copeland claimed he actually saw

ly that Ginyard would have helped himself by presenting testimony that Curtis gave his gun to Vernon so that Vernon could pass it on to Ginyard. If believed, such testimony would have tended only to corroborate Copeland's identification of Ginyard rather than Curtis as the person who shot him. Accordingly, we reject Ginyard's *Brady* claim.

### D.

■ Ginyard contends that the trial court violated his Fifth Amendment right to due process and his Sixth Amendment right to present witnesses in his defense when it sustained Curtis's privilege against self-incrimination and failed to require the government to grant Curtis use immunity so that he could testify that he gave his gun to Vernon and not to Ginyard. Ginyard argues that Curtis had waived his privilege, and in any event that Curtis's testimony was so critical to his defense that under *Carter v. United States*, 684 A.2d 331 (D.C.1996) (en banc), the trial court should have advised the government to immunize Curtis or risk dismissal of the indictment. For several reasons, we reject Ginyard's arguments and conclude that there was no violation of his Fifth or Sixth Amendment rights.

■ To begin with, the record does not support Ginyard's claim that Curtis had waived his privilege against self-incrimination. The government reportedly told Ginyard's counsel that Curtis had admitted writing the letter that triggered his investigation for obstruction of justice, but that did not necessarily mean that Ginyard had waived his right not to be compelled to testify about that letter in the future. For example, a suspect who voluntarily makes admissions to the police at the time of arrest does not thereby waive his Fifth Amendment privilege for future proceedings, and "[t]he general rule is that a witness who voluntarily testifies in one proceeding does not waive his Fifth Amendment privilege in a separate proceeding." *Salim v. United States*, 480 A.2d 710, 713–14 (D.C.1984). It is not suggested that Curtis made the alleged admission in a grand jury or pretrial proceeding incident to his or Ginyard's prosecution (or as part of his plea of guilty to carrying a pistol without a license). *Cf. Harris v. United States*, 614 A.2d 1277, 1282 (D.C.1992) (acknowledging that a defense witness who testified voluntarily at a pretrial suppression hearing may not invoke the privilege to avoid testifying on the same issues at the ensuing trial); *Ellis v. United States*, 135 U.S.App. D.C. 35, 44, 416 F.2d 791, 800 (1969) (holding that a witness who testifies voluntarily before the grand jury may not claim the privilege when called to testify at the trial on the indictment that the grand jury returned). Ginyard argues that if the record as it now stands fails to show waiver, we should remand the case to permit him to expand the record. We are not persuaded by that argument. The burden was on Ginyard to substantiate his claim of waiver the first time around, but he did not ask the trial court for permission to do so.

■ Furthermore, Ginyard's reliance on our decision in *Carter* is misplaced. In *Carter* we held, *inter alia*, that a trial court might dismiss an indictment to pro-

---

the transfer, and if so whether he saw Curtis hand the gun directly to Ginyard or to an intermediary (i.e., Vernon)—was not explored at trial or emphasized in closing argument. Ginyard does not contend that Curtis's testimony would have been material under *Brady*

merely because it arguably would have countered the detective's testimony about Copeland's pretrial statement, and we think such a contention would be untenable in the circumstances.

tect a defendant's Fifth and Sixth Amendment rights if the government's refusal to grant use immunity to a proposed defense witness would distort the fact-finding process at trial by preventing the witness from furnishing "material, exculpatory, non-cumulative evidence [that is] unobtainable from any other source." 684 A.2d at 345. That holding is inapplicable here for at least three distinct reasons. First, Curtis was not a proposed defense witness. Ginyard did not seek to present Curtis's testimony or ask the government to immunize Curtis to enable him to be a defense witness. Where a defendant would not call a witness to testify in any event, the failure of the government to grant the witness immunity does not jeopardize the defendant's rights or entitle the defendant to any relief.

Second, Curtis's testimony that he gave the gun to Vernon rather than to Ginyard does not satisfy the stringent requirements of *Carter*. As we concluded in discussing Ginyard's *Brady* claim, that testimony would not have been materially exculpatory. Nor did Ginyard establish that the evidence was unobtainable from any other source, i.e., that he could not have presented equivalent testimony from Vernon. Of course had Vernon testified and admitted receiving a gun from Curtis, he also might have said that he handed the gun to Ginyard, which would have defeated Ginyard's purpose—but that possibility only underscores the fact that Ginyard did not show that the fact-finding process at his trial was distorted by the absence of Curtis's testimony.

Third, we do not accept at face value Ginyard's premise that the trial court's ruling prevented him from calling Curtis to testify that he gave his gun to Vernon

and not to Ginyard. Having pled guilty to carrying the gun in exchange for the dismissal of the other counts of the indictment against him, Curtis neither had nor claimed a privilege not to testify about what he did with the gun. The court sustained Curtis's Fifth Amendment privilege only with respect to the incriminating letter that he allegedly wrote. But the government disavowed any intention to question Curtis about that letter, and we have been given no reason to think that the government would have sought to do so despite that disavowal if Ginyard had called Curtis as his witness. It therefore appears that no grant of use immunity was necessary to enable Ginyard to present the testimony he claims he needed from Curtis.

## III.

Ginyard also contends on direct appeal that his conviction for aggravated assault while armed (AAWA) in violation of D.C.Code §§ 22–504.1,–3202 (1996)[6] should be vacated because it merges with his conviction for assault with intent to murder while armed (AWIMWA) in violation of D.C.Code §§ 22–503, 22–2401, 22–3202 (1996).[7] Ginyard argues that in creating the two offenses as part of a common statutory scheme covering different grades of assault, Congress did not intend to authorize a double penalty for a single assaultive act. The District of Columbia Circuit Court adopted this view in *United States v. McLaughlin*, 334 U.S.App. D.C. 1, 14–15, 164 F.3d 1, 16 (1998). We are bound, however, by the later decision of this court in *Nixon v. United States*, 730 A.2d 145 (D.C.1999). In *Nixon* a division of the court held that AAWA does not merge with the offense of assault with intent to kill while armed (AWIKWA),

---

**6.** Now codified as D.C.Code §§ –404.01,–4502 (2001).

**7.** Now codified as D.C.Code §§ 22–403, 22–2101, 22–4502 (2001).

which is a lesser included offense of AW-IMWA, because each of those offenses requires proof of a fact that the other does not. *Id.* at 152. *A fortiori*, the same is true of AAWA and AWIMWA. AAWA requires proof of serious bodily injury, *see Gathy v. United States*, 754 A.2d 912, 919 (D.C.2000), which AWIMWA does not; while AWIMWA requires proof of a specific intent to kill and malice, *see Howard v. United States*, 656 A.2d 1106, 1114 (D.C. 1995), which AAWA does not. Under *Nixon* we must reject Ginyard's merger claim.

■ We agree, however, with Ginyard's second merger contention, which concerns his two convictions for possession of a firearm during a crime of violence or dangerous offense (PFCV) in violation of D.C.Code § 22–3204(b) (1996).[8] A single possession of a single firearm during a single violent act gives rise to only a single PFCV conviction. *See Nixon*, 730 A.2d at 153. On remand, therefore, one of Ginyard's PFCV convictions shall be vacated.

## IV.

### A.

Ginyard filed a post-trial motion to set aside his convictions on the ground that his trial counsel, Daniel Harn, was constitutionally ineffective in failing to call four witnesses whose testimony would have substantiated his defense that it was Ricardo Curtis who shot Copeland. Ginyard supported his motion with his own affidavit and an affidavit from each of the putative witnesses. Two of these witnesses said they were present when the shooting took place. In her affidavit, Kim Henson, who was Ginyard's aunt, averred that she was standing "right beside" Ginyard when she saw Curtis come up and shoot Copeland. Henson stated that she had provided this information to Ginyard's defense counsel and investigator before trial, was subpoenaed and came to court, but was not called to the stand. According to Henson, "Erik's lawyer said he don't need me." In his own affidavit, Ginyard said that "Mr. Harn told me he was not going to call [Henson] because she was my aunt, and he thought the jury would think she would lie." A second affiant, Dominique McFadden, who identified himself as Anton Parker's nephew, described the shooter as a man dressed in black who covered his face when he appeared from behind a trash can and started firing. McFadden also averred that he later asked Copeland who shot him and Copeland answered that it was Curtis. McFadden said he came to court after defense counsel interviewed and subpoenaed him, but counsel "didn't use me because he said I was no good. I don't know what he meant by that." Ginyard said in his affidavit that Mr. Harn did not tell him why he did not call McFadden as a witness.

The other two affiants said they saw Curtis shortly after Copeland was shot. Marjorie Preston averred that Curtis came by her mother's house, "breathing hard, nervous looking, out of breath." Preston overheard someone tell Curtis "you better piss on your hand." Ginyard interprets this remark to mean that the unknown speaker was advising Curtis how to eradicate traces of gunpowder deposited on his hand when he fired a gun. Preston heard "other dudes [who] were standing out there" tell Curtis he had better leave. Curtis said he had no money, and someone gave him a dollar. Curtis then ran off. Preston said she told what she knew to Ginyard's counsel. According to Ginyard's affidavit, "Marjorie came to my trial, but Mr. Harn told me he was not going to call her to testify, because she was my aunt

8. Now codified as D.C.Code § 22–4504(b) (2001).

[and] ... the jury would think she was lieing [sic]." The fourth affiant, Jean Goldsmith, said that she saw Curtis pass her front porch "wearing a black t-shirt, running very fast, by himself." Goldsmith also said that "nobody ever came to talk to me about what I saw on that day." Ginyard did not mention Goldsmith in his affidavit.

In opposing Ginyard's motion for a new trial, the government submitted the affidavit of Ginyard's trial counsel Daniel Harn. Harn said that he had obtained the names of potential witnesses from Ginyard and his mother and that he had canvassed the neighborhood with his investigator to find witnesses. Harn had interviewed Henson, McFadden and Preston, but not Goldsmith, whom no one had identified as a possible witness. "[A]pparently," Harn observed, Jean Goldsmith "never told anyone what she now says she witnessed." After Coppedge, Monroe and Parker testified that Ginyard was not the person who shot Copeland, Harn advised Ginyard and his mother against calling the remaining potential defense witnesses. Harn averred that "Mr. Ginyard and his mother agreed to the strategy because the government had only one eye witness and the witnesses we called were more effective than the other available witnesses. We also were afraid that any conflict in the defense witnesses' testimony would hurt Mr. Ginyard's case." Harn gave the following specific reasons why he and his client decided not to call Henson, McFadden and Preston even though they were available to testify.

As to Kim Henson, Harn stated that when he initially interviewed her, she told him only that "[s]he [9] was sitting on the corner after the shooting and that Ricardo Curtis came running up and got some money to get out of the area." "Over time," however, Henson "added important details that conflicted with other witnesses' statements." In particular, Harn said, Henson's statement that she was standing next to Ginyard when Copeland was shot conflicted with what she had previously said and with the testimony of the witnesses at trial. Harn advised against calling Henson "because of her record [convictions for theft and a weapons offense], her conflicting testimony, and her relationship as Mr. Ginyard's Aunt."

Turning to Dominique McFadden, Harn explained that in spite of his friendship with Ginyard, McFadden was a "reluctant witness." Harn "had to repeatedly track him down to try to get him to come to court" and had been compelled to ask the court to issue a bench warrant to secure his appearance when he failed to appear on the first day of trial. (The trial transcript confirms that the bench warrant was issued.) Harn characterized McFadden as "a juvenile who had his own troubles," though he did not explain what those troubles were. Moreover, Harn said, McFadden's "story was essentially the same as Anton Parker's; he did not identify the shooter [and said] only that Mr. Ginyard did not do it." Since McFadden's testimony "at best would be cumulative and would be impeached" because of his friendship with Ginyard, Harn averred, "we decided not to call him."

Finally, Harn stated that he advised against calling Marjorie Preston because she was Ginyard's aunt, no one had mentioned her to him until she showed up at the courthouse on the day of trial, "[h]er story was essentially the same one that Kim Henson first gave me," and no wit-

---

9. Harn's affidavit says "he" but the context makes clear that "she," i.e., Henson, is in-

tended.

nesses other than Henson remembered Preston being present.

Ginyard did not contest Harn's averments.

The trial court denied Ginyard's motion on the papers, deeming a hearing unnecessary in the absence of any real dispute about why Harn did not call the witnesses whom Ginyard identified. In the case of Jean Goldsmith, the court found that Ginyard had proffered no evidence that Harn knew or should have known before trial that she could provide exculpatory testimony, or even that she was a witness. Ginyard therefore failed, the court held, to shoulder his initial burden of showing that Harn's failure to call Goldsmith "fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In the case of the other three witnesses, the court found that Harn had thoroughly investigated their testimony and had made a plausible strategic choice not to call them, "given that their testimony was cumulative and they could be impeached for bias." Heeding the admonition of the Supreme Court that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland,* 466 U.S. at 690, 104 S.Ct 2052, the court concluded that Ginyard had failed to show that Harn's "choice not to call the witnesses was outside the wide range of competence allowed by the Sixth Amendment."

On appeal, Ginyard contends that the trial court abused its discretion in not holding a hearing on his motion to set aside his convictions, and that the court erred in finding on the record before it that his trial counsel made reasonable strategic choices in failing to call Henson, McFadden and Preston as witnesses.[10] We address each of these contentions in turn.

### B.

 "There is a presumption in favor of holding a hearing on a § 23–110 motion alleging ineffective assistance of counsel that requires an inquiry into matters outside the record." *Ready v. United States,* 620 A.2d 233, 234 (D.C.1993); *see* D.C.Code § 23–110(c) (2001) (hearing is required "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief"). So, for example, "[i]n almost every instance where the credibility of counsel versus the credibility of the defendant is at issue, the court can resolve the conflict only by conducting an evidentiary hearing." *Reaves v. United States,* 694 A.2d 52, 58 (D.C. 1997). "Similarly, where the defendant alleges that counsel failed to call a particular witness to testify on the defendant's behalf, counsel may have had valid reasons for not calling the witness, but because the reasons are usually not in the record, an evidentiary hearing is normally required." *Id.*

 The presumption in favor of an evidentiary hearing is rebuttable, however. The trial court has discretion in deciding whether a hearing is needed. *See Sykes v. United States,* 585 A.2d 1335, 1340 (D.C. 1991).[11] "Where the existing record pro-

---

**10.** Ginyard does not contend on appeal that Harn was ineffective in failing to call Goldsmith.

**11.** "This rule is a salutary one, for the trial judge, who has seen the defense attorney in action and watched the evidence unfold, is [often] in a far better situation than an appellate court to determine whether there is any appreciable possibility that a hearing could establish either constitutionally defective representation or prejudice to the defendant in the *Strickland* sense." *Id.*

vides an adequate basis for disposing of the motion, the trial court may rule on the motion without holding an evidentiary hearing." *Ready, supra.* Thus, if no genuine doubt exists about the facts that are material to the motion, the court may conclude that no evidentiary hearing is necessary.

■■■ The trial court in this case perceived no real dispute over the facts that were material to Ginyard's ineffective assistance claim. We share that perception. Ginyard did not identify any material factual issue that required an evidentiary hearing to resolve. There was no important conflict in the affidavits before the court. There was no dispute about the credibility of Ginyard, Harn and the other affiants. There was no dispute about the testimony that Henson, McFadden and Preston could have given at trial. There was no dispute that Harn had interviewed those witnesses before trial and knew generally what they had to say. There was no dispute that Harn had the witnesses under subpoena and available to testify. Most importantly, there was no dispute about Harn's reasons for not calling Henson, McFadden and Preston. His reasons were credible and were corroborated by the record, including the affidavits that Ginyard submitted in support of his motion. For example, as the trial court noted, Ginyard's affidavit corroborated Harn in recounting that Harn told Ginyard he would not call Henson and Preston because they were Ginyard's aunts and the jury would not believe them. Similarly, the fact that Harn had to ask the court to issue a bench warrant for McFadden when he did not come to court on the first day of trial corroborated Harn's averment that McFadden was a reluctant witness.

Ginyard did not challenge the truth of Harn's reasons, but rather their soundness. Since that challenge presented a question of law rather than of fact, the trial court did not abuse its discretion in deciding the issue without holding an evidentiary hearing.

## C.

To prevail on his Sixth Amendment claim of ineffective assistance of counsel, Ginyard needed to demonstrate (1) that Harn's performance was deficient, and (2) that the deficient performance prejudiced his defense. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052 . The trial court determined that Ginyard did not show deficient performance. The court therefore did not reach the question of prejudice. Neither do we.

This court recently summarized the principles bearing on the question of constitutionally deficient performance of counsel as follows:

"Deficient performance," the Supreme Court held in *Strickland,* means "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687, 104 S.Ct. 2052. The standard "is that of reasonably effective assistance . . . . The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 687–88, 104 S.Ct. 2052. "[I]n any given case," there may be "a wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. It follows that "[w]hen evaluating the performance of counsel, trial counsel must be given sufficient latitude to make tactical decisions and strategic judgments which involve the exercise of professional abilities." *Woodard [v. United States],* 738 A.2d [254,] 257 [ (D.C.1999) ]. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengea-

ble." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. "[M]ere errors of judgment and tactics as disclosed by hindsight do not, by themselves, constitute ineffectiveness." *Lane v. United States,* 737 A.2d 541, 549 (D.C.1999) (quoting *Curry v. United States,* 498 A.2d 534, 540 (D.C. 1985)).

*Leftridge v. United States,* 780 A.2d 266, 272 (D.C.2001).

■ Applying these principles, the trial court concluded that Harn made a reasonable, and hence constitutionally permissible, choice not to call Henson, Preston and McFadden as witnesses because they could be impeached and their testimony added little to that of the other defense witnesses. We agree with the trial court's assessment. Having interviewed the potential witnesses and arranged for them to be available, Harn made his choice after thorough investigation and preparation. *Cf. Frederick v. United States,* 741 A.2d 427, 439 (D.C.1999) (finding deficient performance where defense counsel did not interview an exculpatory eyewitness and have him available for trial); *Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992) ("The failure to make a proper pretrial investigation, to interview exculpatory witnesses, and to present their testimony, constitutes constitutional ineffectiveness."). Harn identified factors specific to each witness that reasonably counseled against putting the witness on the stand lest the witness be discredited to the overall detriment of the defense: the witness's close relationship to Ginyard (all three witnesses), reluctance to testify (McFadden), inconsistent recounting of events (Henson), conflicts with the testimony of other witnesses (Henson and Preston), delay in coming forward (Preston), and criminal record (Henson). There was no question about

any of these factors. *Cf. Gillis v. United States,* 586 A.2d 726, 728–29 (D.C.1991) (holding that where counsel claims he had "reasons" for deciding not to call exculpatory witnesses but does not state what those reasons were, counsel's decision cannot be found to be a matter of reasonable trial strategy). The option not to call Henson, Preston and McFadden in light of their negatives was plausible because their potential testimony was largely cumulative of other evidence. Other witnesses testified that Ginyard was not the shooter, and that Curtis brought a gun to the scene, fired it at Copeland and fled. Moreover, Copeland himself admitted at trial that he told Harn, Harn's investigator and Ginyard's mother that Ginyard was not his assailant. *Cf. Byrd,* 614 A.2d at 30 (holding counsel ineffective for failing to present the testimony of exculpatory witnesses despite their potential drawbacks, where that decision left the defendant with the unpalatable choice of either testifying and being impeached with his prior criminal convictions or remaining silent and leaving the prosecution's case uncontradicted).

Ginyard argues that McFadden and Preston could have furnished testimony that no other witness provided. In marginal respects, we assume that to be so. McFadden could have testified that Copeland told him it was Curtis who shot him. But Harn reasonably could discount the incremental value of this testimony in balancing it against the risks of calling McFadden as a witness, since Copeland admitted telling people that Ginyard did not shoot him when he was afraid of what might happen to him if he told them the truth. Preston could have described Curtis's physical appearance after the shooting and the direction in which he fled. But as it was undisputed that Curtis fled from the scene, those details that Preston could

have offered were of little import.[12]

Ginyard accords special significance to Preston's report that someone advised Curtis to urinate on his hand because it supposedly implied that Curtis recently had fired a gun that left a residue of gunpowder on his skin. Even if that was the implication of the remark that Preston overheard, however, that remark was not admissible in evidence because it was hearsay, and Ginyard could not have established either that the unknown speaker had personal knowledge that Curtis had fired a gun or that the remark fell within any recognized exception to the rule against hearsay.

The remark was hearsay because it was an out-of-court statement that (by Ginyard's hypothesis) asserted implicitly if not explicitly that Curtis had just fired a gun, and it would have been offered solely to prove the truth of that implicit fact. (The remark would not have been relevant if offered for any other purpose, such as to prove the speaker's state of mind or the effect of the remark on Curtis or other hearers.) *See United States v. Cardascia,* 951 F.2d 474, 486–87 (2d Cir.1991) (finding a resignation letter to be hearsay because it was admitted to prove the declarant's implicit assertion that he was not a member of the conspiracy); *United States v. Reynolds,* 715 F.2d 99, 103–04 (3d Cir. 1983) (finding the statement "I didn't tell them anything about you" to be hearsay because it was offered "to prove the truth of the assumed fact ... implied by its content" that the person to whom the statement was directed was involved with the declarant in criminal activity).

Just as testifying witnesses must have personal knowledge of the subject of their testimony, *see Smith v. United States,* 583 A.2d 975, 983–84 (D.C.1990), hearsay declarants must have personal knowledge of what they assert in order for their declarations to be admissible. *See* Fed.R.Evid. 803 advisory committee's note ("In a hearsay situation, the declarant is, of course, a witness, and neither this Rule nor Rule 804 dispenses with the [Rule 602] requirement of firsthand knowledge."); *see also State v. Jones,* 311 Md. 23, 532 A.2d 169, 172–73 (1987). In the present case, the hearsay statement to Curtis was not admissible unless the declarant had personal knowledge that Curtis had just fired a gun. Ginyard has adduced no evidence of such personal knowledge. In fact, Preston's affidavit suggests that the declarant was not present at the shooting of Copeland, because it states that the declarant was one of the "other dudes ... standing out there" by Preston's mother's house when Curtis came by "out of breath." Absent evidence that the declarant based his remark on his "own sensory perceptions," the remark was inadmissible. *Jones,* 532 A.2d at 173.

Moreover, the remark does not fall within a recognized hearsay exception. The closest possibilities are the exception for excited utterances and the exception for present sense impressions. But the remark cannot be found to have been an excited utterance, particularly without evidence that the unknown declarant witnessed the shooting of Copeland. *See Nicholson v. United States,* 368 A.2d 561, 564 (D.C.1977) (requiring "the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant"). And the remark was not a statement of a present sense impression because it was an instruction or a suggestion, not a description of something the

---

**12.** It perhaps is noteworthy that Preston did not claim to have seen Curtis in possession of a gun. That fact might have undermined Ginyard's claim that Curtis was the shooter.

declarant was observing. *See Burgess v. United States*, 608 A.2d 733, 737 (D.C. 1992) (Rogers, C.J., concurring).

Harn's witness choices may have been debatable, and with the clarity of hindsight after a guilty verdict it might appear that other choices would have been preferable. But that does not mean Harn's choices were unreasonable under prevailing professional norms. Ginyard has not demonstrated such unreasonableness.

## V.

For the foregoing reasons, we affirm Ginyard's convictions and the denial of his motion for a new trial. As one of Ginyard's two PFCV convictions must be vacated, we remand the case for resentencing.

*So ordered.*