Darryl N. DAVIS, Appellant,

v.

UNITED STATES, Appellee.

No. 95–CF–1281.

District of Columbia Court of Appeals.

Argued June 16, 1997.

Decided Sept. 4, 1997.

A. Fulani N. Ipyana, Public Defender Service, with whom James Klein and Gretchen Franklin, Public Defender Service, were on the brief, for appellant.

Ronald Machen, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr. and Shanlon Wu, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, RUIZ, and REID, Associate Judges.

RUIZ, Associate Judge:

Found guilty by a jury of kidnapping and robbery, Darryl Davis raises several issues on appeal, none of which we find warrants reversal. Davis claims that the introduction

of a plastic pistol obtained from him at a date seven weeks after the incident for which he was charged wrongfully suggested Davis's criminal predisposition to the jury. He further alleges that the *Winters* anti-deadlock instruction given to the jury coerced a verdict. We affirm.

Davis was originally charged with armed robbery, kidnapping while armed, and possession of a firearm or imitation firearm during the commission of a crime of violence. The evidence at trial showed that Davis confronted his victim in a parking garage, his hand in his jacket, and threatened that he had a gun. He forced the victim into the car, during which she felt a hard object against her side but did not see a gun. Davis forced his victim to drive to an ATM and withdraw money, at which point she threw the money at her assailant and ran for help. Davis was arrested seven weeks later during a separate incident; a plastic pistol found in his possession at the time of his arrest was entered into evidence at trial. Davis was acquitted of armed robbery, kidnapping while armed and possession of a firearm or imitation firearm during commission of a crime of violence, but convicted of the lesser included offenses of kidnapping and robbery.

### I. The *Winters* Instruction

 The trial court gave a *Winters* [1] instruction when, after approximately seven hours of deliberation, the jury sent a note explaining that "[w]e feel that we are not going to reach a verdict no longer [sic] how long we sit here. There are people on the jury who have stated they are not willing to change their minds *no matter what.*" (Emphasis in original.) The determination of whether coercion exists in a particular case is made by considering the coercive potential of the situation from the jurors' perspective and the effect of the actions of the trial judge in exacerbating or alleviating potential coercion. *(Robert) Harris v. United States*, 622 A.2d 697, 701–02 (D.C.1993). We are unpersuaded that the trial court abused its discretion

either by giving the *Winters* instruction or by giving a written copy of the instruction to the jurors.

Davis argues that external factors affecting the jury—one juror's school attendance and another's job situation—when coupled with the *Winters* instruction, created a coercive situation and potentially coerced a verdict. One juror (Juror 296) was concerned with his ability to attend class while another (Juror 844) said he had been fired from his job due to jury service. The jury was not officially made aware of Juror 844's problems, and Juror 844 assured the court on two separate occasions, the second after himself being assured that the circumstances surrounding his firing were being looked into, that he could fairly proceed with the deliberations despite his personal problems.[2] The jury was aware of Juror 296's desire to attend class and the court made accommodations to allow the juror to attend class by allowing a longer lunch period. Juror 296 likewise assured the court that despite scheduling conflicts he could deliberate fairly.

Unlike *Morton v. United States*, 415 A.2d 800, 802 (D.C.1980), where the court found substantial risk of a coerced verdict after a *Winters* instruction was given to a jury on which one juror had asked to be excused due to the fact that her brother had died, in the present case neither juror asked to be removed. To the contrary, both were given the opportunity to express their concerns before deliberations began and the alternate jurors were dismissed. Neither juror's problem reached the level of a death of a sibling, and neither was particularly unusual given the nature of jury duty, which presupposes a disturbance of an individual's normal life. To the extent possible, the trial court accommodated the student juror's schedule and investigated the alleged firing of the other juror at issue. Under the circumstances, the *Winters* charge was not coercive.

Davis further argues that the trial court abused its discretion by not exercising its discretion, adhering instead to its uniform

---

1. *Winters v. United States*, 317 A.2d 530, 534 (D.C.1974) (en banc).

2. When the Jury Office contacted Juror 844's employer, it was told that he was not terminated because of his participation in jury duty, but because of job-related problems.

policy of giving the *Winters* instruction. *Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979). It is clear from the record, however, that the trial court considered the alternatives presented by both Davis and the government and, based on experience, preferred to give the *Winters* instruction.[3]

■ It is within the discretion of the trial court which "anti-deadlock" instruction it chooses to give. *Epperson v. United States,* 495 A.2d 1170, 1173 (D.C.1985). It is also within the discretion of the trial judge to fashion his or her own anti-deadlock instructions so long as they do not exceed the pressure for a verdict presented by the *Winters* charge. *Id.* at 1175.[4] The trial court, after having decided that the "strongly worded note" received from the jury evidenced a deadlocked jury and considering the nature of the case and the time the jury had deliberated, was well within its discretion both to give an anti-deadlock instruction and to refuse the addition of portions of the "Gallagher instruction"[5] suggested by defense counsel.

■ Davis's third contention is that the trial court committed reversible error when it gave a copy of the *Winters* instruction to the jury. He contends that giving a copy of the instructions to the jury is tantamount to repeating (or repeatedly giving) the instruction by reading it over and over again. In *Epperson, supra,* this court held that absent "extenuating circumstances, *e.g.,* if there is confusion and there is a request by the 'hung jury' for a repetition of the anti-deadlock instruction ... or there is some exceptional circumstance which makes evident it is not likely to be coercive to reinstruct ..." an anti-deadlock instruction should not be repeated. 495 A.2d at 1175–76. We noted that the decision should not be understood as prohibiting a jury from being reinstructed if it did not understand the first charge or requested guidance, and opined that perhaps

other "compelling factual situations" would arise in the future. *Id.* at 1174 n. 7. The present case presents one such factual situation.

Davis argues that there is a "distinct difference between repeating an instruction that the jury has indicated it does not understand, and repeatedly telling the jury to resolve its impasse" by repeating the instructions. Neither of these alternatives, however, describes the situation presented in this case. While the trial court provided a written copy of the *Winters* instruction to the jury, it did not repeatedly *give* the instruction as contemplated by *Epperson.* *Epperson* was concerned that a repeated instruction at the instance of the judge, instead of at the request of the jury, served as reproof, rather than instruction. *Id.* at 1174 (citing *United States v. Seawell,* 550 F.2d 1159, 1163 (9th Cir.1977)). *Epperson* makes repetition of an anti-deadlock charge virtually *per se* coercive, but only when such repetition is at the instance of the trial court rather than the jury. *Id.* at 1174–76. Here, one juror requested a copy of the *Winters* instruction and the judge required each member of the jury to agree to the request before providing the requested copy of the instruction to the jury. The element of coercive reproof inherent in repeating the instruction, against which the *Epperson* guidelines seek to protect, was not present.

## II. The Relevance of the Plastic Pistol

■ Davis raises a serious issue about the relevance, if any, of the plastic pistol introduced at trial, given its tenuous temporal relationship to the crime and the victim's inability to describe the weapon allegedly used during the crime. In order for a weapon to be relevant it must have some connection to both the defendant *and* the crime. *King v. United States,* 618 A.2d 727, 728–29 (D.C.1993) (finding relevance established when complainant's description and identification of the gun used at crime matched the

---

**3.** Although the government had requested that the trial court either give no instruction or give an instruction on returning a partial verdict, it did not object to the giving of the *Winters* instruction.

**4.** The *Winters* instruction has been approved as a proper charge and it is not within the province of

this division to examine the en banc decision. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

**5.** The "Gallagher instruction" is the alternative to the *Winters* instruction suggested by Judge Gallagher in his concurring opinion in *Winters, supra,* 317 A.2d at 539.

gun possessed by defendant two weeks later); *Swinson v. United States,* 483 A.2d 1160, 1163–64 (D.C.1984) (considering the weapon's connection to both the defendant and the crime in relevancy determination); *Lee v. United States,* 471 A.2d 683, 685 (D.C. 1984) (same). It is not necessary for us to decide this point, however, because even if we assume that the plastic pistol was irrelevant as a matter of law to the offense charged, its introduction presented no prejudice to Davis sufficient to require reversal.

The trial court instructed the jury to "consider [the plastic pistol] only for the limited purpose of deciding whether an object was used by the person who robbed the complainant, and whether the replica introduced in court was, in fact, the object that was used." The jury is presumed to have followed the trial court's instructions. *(Thomas) Harris v. United States,* 602 A.2d 154, 165 (D.C.1992); *Owens v. United States,* 497 A.2d 1086, 1092 n. 7 (D.C.1985). Assuming the jury to have followed the trial court's instructions, the verdict of acquittal on the armed and firearm charges could have been reached by findings that Davis was the perpetrator of the crimes but either 1) did not possess the plastic pistol while committing the crimes; or 2) did possess the plastic pistol admitted into evidence, but it was not an imitation firearm within the definition of the statute, D.C.Code §§ 22–3202, –3204(b) (1996). Either finding would be consistent with the jury verdict following the trial court's instructions and the evidence on record. To accept the argument that admission of the plastic pistol suggested Davis's general criminal propensity would require this court to presume the jury ignored the trial court's instructions and considered the evidence for purposes other than instructed. This court will not upset a verdict by assuming that the jury declined to follow the trial court's instructions. *Gray v. United States,* 589 A.2d 912, 918 (D.C.1991).

The judgment of the trial court is hereby affirmed.

*So ordered.*