**Raymond E. MOZEE, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 02–CF–941, 04–CO–1649.**

District of Columbia Court of Appeals.

Argued Jan. 17, 2006.

Decided Jan. 8, 2009.

**154**

Deborah A. Persico, with whom Joseph A. Virgilio, appointed by the court, was on the brief, for appellant.[1]

John P. Gidez, Assistant United States Attorney, with whom Kenneth L Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, Thomas J. Tourish, Jr. and Joan Draper, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, GLICKMAN and KRAMER, Associate Judges.

KRAMER, Associate Judge:

Appellant Raymond Mozee appeals his jury trial conviction for first-degree sexual abuse, in violation of D.C.Code § 22–4102 (now codified at D.C.Code § 22–3002). He contends that the trial court committed reversible error in failing to instruct the jury correctly on first-degree sexual abuse [2] and the affirmative defense of consent,[3] that it coerced the jury with an improper anti-deadlock instruction, that the prosecutor engaged in misconduct, and that he was prejudiced by the ineffective assistance of his counsel. While the trial court erred in instructing the jurors that they were not to consider evidence of consent unless they first found that the sexual assault had occurred, the appellant did not object to the instructions at trial, and the error did not affect the appellant's substantial rights. None of the appellant's other issues constitutes reversible error. We affirm.

## I. Factual Summary

The government presented evidence that on the day of the events underlying this appeal, the appellant raped the complainant, K.W., who was appellant's ex-girlfriend and the mother of their then two-year-old son. K.W. testified that she had known the appellant for about six

---

1. Deborah Persico argued before the panel, but was not named on the brief.

2. The First Degree Sexual Abuse statute reads, in pertinent part: "A person shall be imprisoned [and may be fined] if that person engages in or causes another person to engage in or submit to a sexual act ... [b]y using force against that other person...." D.C.Code § 22–4102 (1996 Repl.).

3. D.C.Code § 22–4107 (1996 Repl.) reads, in pertinent part: "Consent by the victim is a defense, which the defendant must establish by a preponderance of the evidence, to a prosecution under [§ 22–4102]."

years, had begun a sexual relationship with him when she was fourteen, and had lived with him, along with her small daughter, for about fourteen months, beginning in the summer of 1998. It was during that time that their son was born, and he was two-years old at the time of the events at issue here. K.W. had moved out when appellant began seeing another woman, but they continued their sexual relationship for a time. Ultimately, K.W. obtained a civil protection order barring the appellant from contacting her except through her mother for purposes of child care and visitation.[4]

K.W. testified that on the day of the events that led to the charges here, the appellant called her to ask that she bring their son over for a visit at the appellant's sister's apartment. Although he had agreed to pick them up several hours before, he had not done so, complaining of fatigue. He also made clear that he wanted to have sex with her. She responded that she did not want to have sex. The appellant arranged for a cab to pick up K.W. at 8:00 p.m. The cab took K.W. and her son to the appellant's sister's apartment. K.W. testified that the appellant let them into the apartment, but that she went back outside to tell the cab driver not to leave even if the appellant told him that he could. K.W. testified that upon learning that she had told the driver not to leave, the appellant punched her in the face and kicked her in the chest. During this assault, her son was standing by her side holding on to her leg. Although K.W. tried to leave the apartment, the appellant dragged her into his sister's bedroom, pulling off her skirt in the process.

K.W. ran to the bedroom window and tried to open it, pulling at the window blinds in an attempt to get the cab driver's attention. At that point the appellant grabbed her and punched her again. During the ensuing struggle, K.W. hit the appellant with a nearby telephone, breaking it. The appellant grabbed her, punched her again and she fell to the floor, hitting her head on a dresser. He ripped off her panties and told K.W. that she "was going to give him some p* *sy." He then raped her, despite her cries for him to stop. He told her that if he could not have her, no one could have her. After he ejaculated, he told her to "get up and get [your] son and get the f* *k out." K.W. took off her sweater, wrapped it around her waist so "no one would notice that [she] was naked" and left. The appellant yelled at her "not to walk out there like that" and threw her skirt at her. She testified that she tried to put the skirt on while carrying her son in one arm and fleeing the apartment toward the waiting cab, but appellant had ripped the drawstring from the waist and it would not stay up.

K.W. ran to the cab and told the driver, "He raped me, he raped me," and asked him to call the police. The cab driver testified that he had seen "somebody grappling at the venetian blinds and then disappear[ ]," so he had already told his dispatcher to send the police. He testified that K.W.'s hair was messed up, her clothes were in disarray, and she was crying and trying to cover her "private area." A young man at the scene gave K.W. a towel to cover herself. The driver testified that the appellant shouted to K.W., "Come and get your goddamn child," and the boy ran to her.

4. The appellant was also convicted of violating the protective order fifteen times between June 5 and July 27, 2001. Evidence of these violations included messages left on K.W.'s answering machine.

The government presented multiple witnesses in support of K.W.'s allegations. Metropolitan Police Department Officer Alan Jenkins testified that he arrived on the scene, found K.W. in the back seat of the cab and noted abrasions on her face. K.W. told Officer Jenkins that the appellant had raped her. Tony Roberts, who lived below the appellant's sister, testified that he called the police after he had heard an altercation upstairs, including "[a] lot of bumping around" and a woman screaming for help. Metropolitan Police Department Detective Demetrica Carter accompanied K.W. to Howard University Hospital and testified that K.W. was "frightened," "distraught," and "really emotional." Detective Carter could clearly see that she had been beaten, noting that "her mouth was busted open." Finally, Dr. Jean Anthony, a sexual assault nurse examiner at Howard University Hospital, testified that K.W. was "very quiet and withdrawn" and reported that the appellant had raped her, but that she found no genital abnormalities or tears of vaginal tissue during the examination.

Police recovered K.W.'s torn panties and other physical evidence from the appellant's sister's apartment. DNA tests on the semen collected by Dr. Anthony confirmed that the appellant was the source.

In addition, the government introduced three tape recordings from K.W.'s home answering machine with messages left by the appellant in which he discussed their relationship and referred obliquely to events underlying these charges. In a message left five days after his arrest, the appellant stated in pertinent part:

Look, girl, I didn't mean to lash out on you like I did, but it's all bottled up inside me, and I tried to turn to you. I'm getting help right now, okay? I've enrolled myself in anger management class and in 101 psychological counsel-

ing. .... I hope like Hell that you okay. And I'm deeply sorry. I deeply regret, baby, that I can't be around you and talk to you or the kids until I get myself together. And I need this help bad because I've turned into something that I never wanted to be. And that's my f* *king fault. My mother always told me, "If you gotta hit 'em, you don't need to be with em." And I love you too much. I don't respect my love by lashing out on you.

Five days later in another message left on K.W.'s answering machine, the appellant stated, in pertinent part:

I know that I messed up and made big mistakes with you, okay? But I know that I would love to reconcile, but I know that you have no trust in me, no honesty and so forth and like that.... I don't like to take my frustration and anger out on you in the manner that we have been going through. That's why I be asking you sometimes just to be with me and make love to me, to let me beat that p* *sy up real bad. And you know, like you said that day, you know that I'm going to do so, and if I do so, I'm going to take all of that frustration out on that little p* *sy. And I'm going to f* *k all of that s* *t out of you ...

The following day, in yet another message left on K.W.'s answering machine, the appellant said:

I'm learning how to deal with all this anger, okay? Because you know I could snap and resort to violence once again, but I'm trying not to do so. I'm learning how to practice what they taught me, okay? And I said I apologize deeply, but I know you can't forgive me for that and I respect that, but there's no reason to keep my kids away from me, okay?

The theory of the defense was that K.W.'s injuries occurred after consensual

sex when she became jealous of Mozee's relationship with Laquita Black, the appellant's girlfriend, and attacked him in a fury. On cross-examination, K.W. denied consenting to sex with the appellant on the day at issue. She did acknowledge that she had sex with him once in the six months preceding these events in exchange for the appellant providing child care. K.W. further testified that he had asked her for sex on other occasions, but that she had refused. K.W. denied being jealous of Ms. Black.

The appellant took the stand in his defense. He testified that he continued to have consensual sex with K.W. after their relationship ended, despite the fact that he was seeing Ms. Black. He specified that they had sex about twice a week in January of that year, ten times in February, and about four times in the month prior to these events.

He further testified that the sex on the date in question was "agreed upon." He asserted that K.W. called him that day and told him that she was bringing their son over so the appellant could watch him. When she arrived, they agreed to have sex in exchange for $100 that K.W. wanted from him. After they had sex, the phone rang. K.W. asked if it was Ms. Black. When he told her that it indeed was Ms. Black, K.W. "[w]ent into a rage," "lashed out" and hit him in the face. The appellant then admitted to hitting K.W. in the face. He claimed that K.W. fell to the floor, but "got back up and got to kicking and swinging again." The appellant testified that he threw her to the floor and dragged her out of the apartment, telling her to get the f* *k out.

## II. Defective Jury Instructions

The appellant argues that the trial court erred in its jury instructions concerning the government's burden of proof and his

affirmative defense of consent. Although the appellant did not object to the instructions at trial, he claims that the trial court's error was plain and warrants reversal. While the instructions were undeniably erroneous, the appellant has not met his burden under the plain error standard to show that the error complained of " 'affect[ed his] substantial rights.' " (*Danny Lee* ) *Johnson v. United States*, 812 A.2d 234, 242 (D.C.2002) (quoting *United States v. Olano*, 507 U.S. 725, 732–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

The trial court gave a number of instructions on the parties' burdens of proof and on the consent defense during the course of the trial. The first came when the trial court interrupted the closing argument of the appellant's counsel. His counsel had included in her argument some comments about missing evidence and the government's burden of proof and said:

> If there was a witness you wanted to hear from, if there was a photograph you wanted to see, if there was testimony you wanted to hear, you don't look to [the defendant], and you don't look to me. You look right there to the government. It's their burden to present you with evidence.

The trial court immediately stopped the argument and called a bench conference. The judge asked the appellant's counsel to correct her statement to ensure that the jury understood that the government's burden extended only to evidence that the appellant committed the crime, and not to evidence that would tend to establish the appellant's consent defense. Appellant's trial counsel indicated that she did not know if she could adequately correct her statement, and thus the trial court agreed to do so. The instruction given by the court was as follows:

Let me correct one thing that the defense attorney just said. And at times in the heat of battle, we may inadvertently misstate something.

The burden of proof as to the sex— this charge here of first degree sex abuse, the government does have— and I will read to you the instructions, the elements that the government has to prove beyond a reasonable doubt, each of those elements, otherwise your verdict must be not guilty.

On the other hand, the defense of consent, and I will give you an instruction on consent too, the burden on that defense of consent is upon the defendant. The defendant has to prove by [a] preponderance of the evidence, the consent defense. But the overall burden is upon the government. But I just want to make sure you understand that. And I will read those to you when I'm giving you my final instructions.

At the conclusion of the closing arguments, the trial court gave the final instructions. Included in the instructions were: (1) the jury should determine whether the government proved the elements of the crime charged beyond a reasonable doubt; (2) if the jury finds that the government did not prove all the elements beyond a reasonable doubt, the verdict must be not guilty and that the jury need not "go to the issue of consent"; (3) should the jury find that the government met its burden, the appellant then had the burden of proving the affirmative defense of consent by a preponderance of the evidence; and (4) if the appellant met the burden of proving consent, the jury was required to find him not guilty.

The trial court instructed the jury to consider all the evidence in the case on at least three occasions. When instructing the jury on direct and circumstantial evidence, the court stated:

[I]n reaching your verdict in this case, you should consider and weigh all the evidence presented, whether direct or circumstantial. In deciding whether the government has established the charge against the defendant beyond a reasonable doubt, you must consider and weigh the testimony of all the witnesses who have appeared before you, including the defendant.

With respect to the charge of first-degree sexual abuse, the trial court instructed the jury as follows:

The essential elements of the offense of first degree sexual abuse, each of which the Government must prove beyond a reasonable doubt are one, that the defendant engaged in a sexual act. Now here the specific sexual act alleged is that the defendant put his penis in the vulva, that is the external part of the female organ.... And then that he did so with the intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of himself or K.W.

*See* Criminal Jury Instructions for the District of Columbia, No. 4.60 (4th ed.2008 rev.). Because an additional element of first-degree sexual abuse is the use of force, the court went on to explain the meaning of force in this context, specifically that "[f]orce ... means the use of such physical strength or violence as is sufficient to overcome, restrain or injure a person." *See id.* Later, it instructed the jury to "consider all the circumstances in evidence that you think are relevant" in determining whether the government had met its burden with respect to the mental state element of first degree sexual abuse. Finally, the court returned to the subject of burdens of proof, instructing the jury that its duty was "based on all the evidence, to determine what the facts were"; that it should "first consider all the evi-

dence" in determining whether the government met its burden before it gets "to this business of consent"; that if the jury found that the government had not met its burden, it should acquit; and that if it found the government had met its burden, it "must consider whether K.W. consented."

 The appellant contends that the trial court's instructions failed to "inform the jury that it could consider appellant's evidence of consent with respect to whether the government proved beyond a reasonable doubt that the act charged was accomplished by force," and that this constitutes reversible error. As the government concedes, our decisions in *Hicks* and *Russell*[5] leave no room for doubt that the trial court erred by instructing the jury not to get "to this business of consent" until after it had considered all of the other evidence. *See Hicks v. United States*, 707 A.2d 1301, 1303 (D.C.1998) and *Russell v. United States*, 698 A.2d 1007, 1015–16 (D.C.1997) ("[W]hen the legislature has not specified otherwise ... the jury should be expressly instructed that it may consider the affirmative defense evidence when it determines whether the government has met its burden to prove all the elements of the offense beyond a reasonable doubt.").

In *Hicks* and *Russell,* we declined to apply a plain error analysis in either case because we found that, unlike here, the objections to the instructional error were preserved. *See Hicks, supra,* 707 A.2d at 1304–05 (holding that plain error review was not warranted where Hicks expressed concern that the court impermissibly shifted the burden of proof); *Russell, supra,*

698 A.2d at 1012–13 (holding that plain error review was not warranted where Russell explicitly challenged the given instructions, though not with the specificity normally required to avoid plain error review). Here though, no objection, however peripherally related to the instructional error, was raised by the defense, and thus we conclude that plain error review is appropriate. *See* Super. Ct.Crim. R. 52(b) (2008).

 Under the plain error doctrine, this court may, at its discretion, "notice defects raised for the first time on appeal if substantial rights were clearly and prejudicially denied below." (*Linwood* ) *Johnson v. United States,* 387 A.2d 1084, 1088 (D.C.1978). To satisfy the plain error test, however, the defendant bears the burden of demonstrating that "there [was] 'error,' *i.e.,* '[d]eviation from a legal rule' "; that the error was " 'plain,' *i.e.,* 'obvious' or 'clear under current law' "; and that the error " 'affect[ed his] substantial rights.' " (*Danny Lee* ) *Johnson, supra,* 812 A.2d at 242 (quoting *Olano, supra,* 507 U.S. at 732–35, 113 S.Ct. 1770 (1993)). Even then, we will not reverse unless the defendant makes the additional showing of "either a miscarriage of justice, that is, actual innocence; or that the trial court's error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.' " *Wilson v. United States,* 785 A.2d 321, 326 (D.C.2001) (quoting *Olano, supra,* 507 U.S. at 736, 113 S.Ct. 1770).

 "In reviewing jury instructions, we must look at the instructions 'as a whole in assessing whether they constitut-

---

**5.** In this regard, this case is substantially different than *Russell, supra.* In *Russell,* the defective instructions explicitly altered the burden of proof by requiring the jury to consider whether the government proved beyond a reasonable doubt that "consent" was involuntary after the jury had determined that the

defendant proved his affirmative defense by a preponderance of the evidence. 698 A.2d at 1011–12. In so doing, the trial court created the possibility that a defense that was already established and sufficient for acquittal under the statute would be negated by further jury deliberations.

ed prejudicial error.'" *Hunt v. United States*, 729 A.2d 322, 325 (D.C.1999) (citations omitted). Here, the government concedes that there was error and that the error was plain, that is, obvious. An error affects a substantial right when it has a "substantial and injurious effect or influence in determining the ... verdict." *United States v. Dominguez Benitez*, 542 U.S. 74, 81, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004). Thus, the standard for whether an error affects a substantial right is "similar[ ] to the *Kotteakos* formulation in requiring the showing of 'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'" *Id.; Wilson, supra,* 785 A.2d at 325 (citing *United States v. Gomez,* 255 F.3d 31, 37 (1st Cir. 2001)). In this case, the appellant cannot show that the error has affected a substantial right.

The factual issues in this case essentially came down to a credibility contest between K.W., who testified that the appellant raped her, and the appellant, who testified that after engaging in consensual sex, K.W. attacked him in a jealous rage when a girlfriend called him at his apartment, causing him to injure her in the course of defending himself. The evidence in support of K.W.'s version of events was compelling. K.W. had taken her two year old son to the apartment with her to visit appellant; she specifically informed the taxi driver not to leave without her even if appellant said he could; while waiting for her to return, the taxi-driver saw someone grappling with the window blinds (as K.W. testified that she had); K.W., half-naked, ran out of the apartment with her clothes in disarray, crying and screaming, "He raped me, he raped me," while trying to cover her "private parts." But as persuasive as this evidence might be, an even more powerful portion of the evidence before the jury were the phone messages that the appellant himself left on K.W.'s answering machine (despite a court order barring him from having any contact with her) that were played and made available to the jury.

The first message was left five days after the events at issue. In it, appellant said, *inter alia,* that he had not meant to lash out at K.W. as he did, that he was getting psychological counseling, that he had enrolled in anger management classes, that he was "deeply sorry," and that he had "turned into something that [he] never wanted to be." In the message that he left five days later, he admitted that he "messed up and made big mistakes with [her]," that he "would love to reconcile," but [he knew] that [she] would have "no trust in me," and concluded by saying that he was "going to f* *k all of the s* *t out of [her]." The next day, he left a third message in which he said, "I'm learning how to deal with all this anger, okay? Because you know I could snap and resort to violence once again, but I'm trying not to do so," and he again apologized, adding "but I know you can't forgive me for that and I respect you for that."

Although the trial court gave clearly erroneous final instructions when it told the jury that it should not get to "this business of consent" until after determining that the government had met its burden, the trial court specifically instructed the jury that it "should first consider all the evidence in the case in determining whether or not the government has proven each of the elements of the offense beyond a reasonable doubt." It also instructed the jury to consider *all* of the evidence in the case when it instructed the jury on direct and circumstantial evidence, as well as intent. Furthermore, the trial court provided proper instructions to the jury on the defense of consent and on the appellant's theory of the case. Jurors are pre-

sumed to follow the trial court's instructions, see, e.g., *Coates v. United States*, 558 A.2d 1148, 1150 (D.C.1989). Indeed, there is nothing in the record to suggest that the court's error in instructing the jurors to "first consider all the evidence" to determine if the government had met its burden of proof before "get[ing] to this business of consent" resulted in the jury overlooking the issue of consent or declining to take the entire record into account during its deliberations. Indeed, it would seem that the tapes in which the appellant essentially admitted to the required element of force (defined by the court's instructions as "such physical strength or violence as is sufficient to overcome a person") virtually ensured discussion of consent, and the jurors deliberated for several days.

Given the tapes of the calls, in appellant's own voice and showing clear contrition, as well as the admissions he made on the calls, we conclude that the strong evidence of appellant's guilt, combined with the efforts made by the trial judge to clarify that the jury was to consider all of the evidence, make it highly improbable that but for the trial court's error the result of the proceeding would have been different. *See Thomas v. United States*, 914 A.2d 1, 21–22 (D.C.2006) (citing *Dominguez Benitez, supra*, 542 U.S. at 81–82, 124 S.Ct. 2333).

In short, given the strong evidence of appellant's guilt and the efforts made by the trial judge to clarify that the jury was to consider all of the evidence, we conclude that appellant is not entitled to a reversal due to the instructional error because the error did not affect his substantial rights.

## III. The Anti-deadlock Instruction

The appellant's second contention is that the trial court coerced the jury into issuing a verdict by giving multiple anti-deadlock instructions. This argument is without merit.

 The facts underlying this issue are as follows. On Friday, after the jury had deliberated for about six hours, it sent a note stating that it had reached an impasse. The trial judge elected not to give an anti-deadlock instruction at that time, but instead simply informed the jury that it was too early to declare them at an impasse, that they should go home for the weekend and that they should resume their deliberations on Monday. On Monday, the jury deliberated until about 3:00 p.m., when it sent a second note indicating that they were still unable to reach a unanimous verdict. The appellant moved for a mistrial or, in the alternative, for the Gallagher anti-deadlock instruction.[6] The court gave the Gallagher instruction and, as with all of the jury instructions, put the

---

**6.** The Gallagher instruction derives its name from Judge George Gallagher, an Associate Judge on the District of Columbia Court of Appeals, who crafted the instruction in his concurrence in *Winters v. United States*, 317 A.2d 530 (D.C.1974). It is among three commonly used anti-deadlock instructions in this jurisdiction specifically endorsed by this Court. *See Epperson v. United States*, 495 A.2d 1170, 1173–75 (D.C.1985); Criminal Jury Instructions for the District of Columbia, No. 2.91 III. C (4th ed.2008 rev.).

The government suggests that because the appellant requested the anti-deadlock instruction, appellant's claim that providing the instruction was error should be treated as invited error and, therefore, would not be appealable. Generally, the invited error doctrine precludes a party from asserting as error on appeal a course that he or she has induced the trial court to take. *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 183–84 (D.C.1993). Here, however, appellant's counsel first moved for a mistrial, which was denied, and then requested the Gallagher anti-deadlock instruction only in the alternative. Accordingly, we do not conclude that there was invited error in this case.

instruction on tape and told the jurors that they could play the instruction if they forgot any part of it. On Tuesday nothing was heard from the jury all day. Thus, they were brought out and told to return on Wednesday. At 1:45 p.m. on Wednesday, the court received a note from the foreperson that read: "Your honor, we the members of the jury have reached a verdict."

The appellant argues that the first instruction to "resume deliberating" constituted an anti-deadlock instruction, and, therefore, that the subsequent Gallagher instruction constituted an impermissible second anti-deadlock instruction. Moreover, he argues, providing the second instruction on an audiotape amplified the coercive effect of the second instruction.

▇▇▇ Whether to give an anti-deadlock instruction is committed to the sound discretion of the trial court. *Carey v. United States*, 647 A.2d 56, 61 (D.C.1994). "The determination of whether coercion exists in a particular case is made by considering the coercive potential of the situation from the jurors' perspective and the effect of the actions of the trial judge in exacerbating or alleviating potential coercion." *Davis v. United States*, 700 A.2d 229, 230 (D.C.1997) (citing *Harris v. United States*, 622 A.2d 697, 701–02 (D.C. 1993)). Furthermore, the " 'anti-deadlock' instruction should not repeatedly be given to a 'hung jury'...." *Epperson v. United States*, 495 A.2d 1170, 1176 (D.C.1985) (*Epperson II* ). Where, as here, the defendant fails to object at trial, our review is for plain error. *Olano, supra*, 507 U.S. at 732–36, 113 S.Ct. 1770. We find no error, let alone plain error in giving the Gallagher anti-deadlock instruction.

▇▇▇ The appellant correctly asserts that an anti-deadlock instruction should be given only once. *Epperson v. United States*, 471 A.2d 1016, 1017 (D.C.1984)

("[T]o twice give [an anti-deadlock instruction] crosses the line into the forbidden area of verdict coercion."). We have specifically held, however, that the course followed by the trial court here is within a trial court's discretion. *See Carey, supra*, 647 A.2d at 60–61 (holding that the trial court had not abused its discretion in first telling a jury to continue deliberating after receiving a note, then later giving an anti-deadlock instruction after receiving a second note, following which the jury reached a verdict).

▇▇▇ The appellant argues that because the trial court's first instruction to resume deliberations constituted an anti-deadlock instruction, the Gallagher anti-deadlock instruction was a second, coercive instruction. However, as we made clear in *Epperson II*, the admonition to give no more than one anti-deadlock instruction applies only to juries determined by the trial court to actually be deadlocked or "hung," which we made clear meant a jury that "the trial judge has concluded is deadlocked, giving due consideration to such things as the nature and complexity of the trial issues, the duration of the trial and the length of jury deliberations...." *Epperson II, supra*, 495 A.2d at 1172. There is no indication that the trial court had reached a conclusion that the jury here was hung on that first day of deliberations, nor that it should have. Issued on the first day of deliberations, the first instruction was merely an instruction to continue deliberating. It included no coercive language of the sort we have called "a temperate prod by the trial judge for a conscientious attempt at a verdict." *Winters, supra*, 317 A.2d at 539 (Gallagher, J., concurring). As such, appellant's claim that the trial court's instruction—"it is too early for me to tell you anything, but resume your deliberations"—constitutes the first of two anti-deadlock instructions is not supported by

the record. Moreover, not only did the jury deliberate for over a day after being given the Gallagher instruction, but we have explicitly upheld in *Carey* the procedure employed by the trial judge here, despite stronger evidence in that case that the jury was actually hung. *See Carey, supra,* 647 A.2d at 60 (noting that the second note sent by the jury read, "Your Honor, some of us are ready to change our opinion just to get out of this room. Is this what you want? Is this perjury? What sort of heroism do you expect?"). As such, the trial judge's actions in this case do not constitute plain error, and there is no evidence of a coerced verdict.

 Nor do we find error in the trial court's decision to provide the jury with an audiotape of the anti-deadlock instruction just as he had done with his other instructions. In general, the decision to provide the jury with a copy of the jury instructions is within the discretion of the trial court. *See, e.g., Smith v. United States,* 454 A.2d 822, 826 (D.C.1983) (citing *Carrado v. United States,* 93 U.S.App.D.C. 183, 193, 210 F.2d 712, 722–23 (1953), *cert. denied,* 347 U.S. 1020, 74 S.Ct. 876, 98 L.Ed. 1141 (1954)).[7] We have likewise found it permissible to provide a copy of an anti-deadlock instruction to the jury. For example, in *Davis v. United States,* 700 A.2d 229, 231 (D.C.1997), we held that the court did not err by sending a written copy of an anti-deadlock instruction to the

jury. We reasoned that it is the repetition of an anti-deadlock instruction *by the court* which creates unacceptable coercion, not the ability of the jury to choose, by its own volition, to read it again. *Id.* (discussing *Epperson II, supra,* 495 A.2d).[8] As in *Davis,* here the trial court provided the anti-deadlock instruction to the jury so that they could review it if they chose. The fact that the instruction was provided on an audiotape has little bearing on its coercive potential. Consequently, we reject the suggestion that the trial court's actions constitute impermissible repetition of the anti-deadlock instruction, or amplification of the coercive force (gentle as that was) of the original Gallagher instruction.

## IV. Prosecutorial Misconduct

 The appellant also contends that the trial judge erred in permitting the admission of (1) evidence that the appellant had committed statutory rape and (2) "inflammatory" evidence that the complainant's two-year-old son was present during the alleged sexual assault. As we explain, neither contention provides a basis for reversing this conviction.

During examination of the complainant, the prosecutor established that she was fourteen when she met the appellant, and that their sexual relationship began "[l]ike four months" after they met. There was no objection to this question. As the prosecutor went through the events in the

---

7. In *Smith,* this court upheld the trial court's decision to deny a new trial where the trial court had provided the jury with a tape recording of the jury instructions. Smith argued that this practice violated his constitutional right to be present at all phases of his trial, including communications between judge and jury. We did not reach the constitutional question, but held that the trial court's submission of the tape was not prejudicial and affirmed. *Smith v. United States,* 454 A.2d 822, 826 (D.C.1983).

8. We wrote in *Davis:*

> *Epperson* was concerned that a repeated instruction at the instance of the judge, instead of at the request of the jury, served as reproof, rather than instruction. *Epperson* makes repetition of an anti-deadlock charge virtually *per se* coercive, *but only when such repetition is at the instance of the trial court rather than the jury.*

*Davis, supra,* 700 A.2d at 231 (internal citations omitted) (emphasis added).

apartment involving the assault, she asked several questions about where K.W.'s son was at the particular time, and also inquired where he was during K.W.'s subsequent trip to the hospital. The prosecutor also mentioned the son during closing argument as she recounted the facts of the case, stating, "And in fact her little boy is grabbing onto her leg at this time and saying stop, stop.... She's trying to hold her kid." Defense counsel made no objection either to the evidence of when their sexual relationship began or to the prosecutor's questions concerning the whereabouts of the child during the events at issue. The appellant now argues that the prosecutor's comments amount to misconduct requiring reversal, and that the trial court's failure to intervene *sua sponte* likewise requires reversal.[9] However, this conduct does not entitle the appellant to reversal under the plain error standard of review that applies to this issue.

Since no objection was made at trial, we review for plain error. *See* Super. Ct. Crim. R. 52(b). As noted above, plain error review places the burden on the defendant to demonstrate that "there [was] 'error,' *i.e.*, '[d]eviation from a legal rule'"; that the error was "'plain,' *i.e.*, 'obvious' or 'clear under current law'"; and that the error "'affect[ed his] substantial rights.'" (*Danny Lee*) *Johnson, supra*, 812 A.2d at 242 (quoting *Olano, supra*, 507 U.S. at 732–35, 113 S.Ct. 1770). Even then, defendant must also show "either a miscarriage of justice, that is, actual innocence; or that the trial court's error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Wilson, supra*, 785 A.2d at 326 (quoting *Olano, supra*, 507 U.S. at 736, 113 S.Ct. 1770). To show that the error affected a substantial right, the appellant must

show "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *Dominguez Benitez, supra*, 542 U.S. at 81, 124 S.Ct. 2333 (citation omitted).

As before, we conclude that it is highly improbable that but for the error complained of here, the outcome of the case would have been different. There was considerable testimony and corroborative evidence against the appellant—including the testimonies of K.W. and the taxi driver about the rape itself, as well as several phone messages in the appellant's own voice, showing clear contrition and making various admissions. *See* Part II ..., *supra* (citing and quoting the tapes of the calls, made in appellant's own voice and showing clear contrition, and noting the admissions he made on the calls); *Thomas, supra*, 914 A.2d at 21–22 (citing *Dominguez Benitez, supra*, 542 U.S. at 81–82, 124 S.Ct. 2333). Furthermore, the prosecutor made no reference to the fact that the appellant's relationship with K.W. would meet the elements of statutory rape. In any event, the trial court intervened and stated as follows:

> You don't need to place people ... We're going to strike that question about what happened to your son. There's been a lot of attention here on what the son was doing and where was he going and so forth which has nothing to do with what you got to decide, and I don't want that to be a consideration in your decision. So we've had enough attention to the son ma'am, so let's move on to something else.

In sum, because the appellant cannot show that the error affected a substantial

---

**9.** As noted, *infra*, the trial court did intervene, telling the prosecutor, "we've had enough attention to the son ma'am, so let's move on to something else."

right, the appellant's argument on this point must fail.

## V. Ineffective Assistance of Counsel

The appellant's final contention is that the motions judge erred in denying, without a hearing, the appellant's D.C.Code § 23–110 motion for a new trial based on ineffective assistance of counsel. The appellant alleged in his motion that his trial counsel (1) failed to object to the trial court's instructions regarding consent; (2) failed to prepare him adequately for his testimony about how, when, and how often he had sex with K.W. and Ms. Black; (3) failed to adequately cross-examine K.W. regarding monies that she had demanded from him; and (4) failed to object to what he considers highly prejudicial, inflammatory evidence submitted by the prosecutor, as discussed in Part IV above.

■■■ In order to demonstrate ineffective assistance of counsel, the appellant must show (1) that his trial counsel's performance was constitutionally deficient, and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). For the reasons noted above, we find that the appellant has failed to satisfy his burden on the second prong with respect to the jury instructions regarding consent and with respect to the prosecutor's questions. *See* Parts II. and IV., *supra* (declining to find that claimed errors affected a "substantial right" because, in light of the considerable testimony and corroborative evidence against the appellant, including the testimony of K.W. and the taxi driver, as well as several phone messages in the appellant's own voice, showing clear contrition and making various admissions, the appellant had failed to prove that but for the trial court's

error the result of the proceeding would have been different). Thus, we need to consider here only the appellant's claims regarding (1) his trial counsel's failure to prepare him for his testimony, and (2) his counsel's failure to adequately cross-examine the complainant about money that the appellant claimed that she had demanded of him.

■■■ Regarding the first of these claims, the appellant's affidavit asserted that trial counsel met with him only a few times before trial and did not prepare him for cross-examination on details such as the dates and places where he and the complainant had previously had consensual sex, how often they had sex, and how often and when he had sex with Ms. Black. He further asserts that this lack of preparation damaged his credibility because he had difficulty remembering details.

The appellant alleges that his trial counsel's performance was "constitutionally deficient," *see Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052, but on the allegations set forth, we are unpersuaded. First, the appellant's motion to admit evidence of prior sexual contacts, filed before the trial, shows that counsel must have discussed this material with the appellant. *See Gordon v. United States,* 582 A.2d 944, 948 (D.C.1990) ("[A]ppellant's statement to the trial judge, that she had told defense counsel over and over again what had happened, belies a claim that she lacked ample time to confer."). Second, the appellant's affidavit in support of his § 23–110 motion concedes that his trial counsel had met with him before trial on multiple occasions. Furthermore, as the government points out, many of the details of the prior sexual contacts in question were discussed during the pre-trial stage in open court with the appellant present. Finally, while credibility was key in this case, given the nature of the details involved, the appellant has

made no plausible showing that any additional preparation would have improved his recall of this evidence, making it impossible for the appellant to show a reasonable probability that the jury's verdict was swayed by his difficulties at trial. Moreover, as noted above, there was considerable testimony and corroborative evidence against the appellant, including the testimony of K.W. and of the taxi driver, as well as several phone messages in the appellant's own voice, showing clear contrition and making various admissions. Therefore, considering this record, we cannot conclude that the appellant has shown a deficiency in his trial counsel's efforts to prepare him for trial, much less one that caused him prejudice sufficient to constitute ineffective assistance of counsel. *See Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052 (requiring a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

▮▮▮ The appellant's second claim of ineffectiveness is that his trial counsel failed adequately to cross-examine K.W. about monies that she had requested from him. K.W. admitted on cross-examination that, among other things, she had asked the appellant for money on at least one occasion and that he had bought her clothes. Even assuming that trial counsel's failure to inquire about these funds was deficient, there is nothing other than the appellant's speculation that tends to show that this additional information would have had any impact on the outcome of the case. *See Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052. Moreover, even if the appellant's trial counsel had cross-examined K.W. more vigorously about the money she requested from the appellant, as noted above, there was considerable testimony and corroborative evidence against the appellant. *See* Parts II. and IV., *supra.* Accordingly, we cannot conclude that the appellant has shown that any deficiency in his trial counsel's efforts in cross-examining K.W. caused him prejudice sufficient to constitute ineffective assistance of counsel. *See Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052 (requiring a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

▮▮▮ Finally, although there is a presumption in favor of holding a hearing on a § 23–110 motion alleging ineffective assistance of counsel, a judge need not hold a hearing "if the motion consists of (1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would merit no relief even if true." *Ready v. United States,* 620 A.2d 233, 234 (D.C. 1993). As discussed above, the appellant's allegations that there is a reasonable probability that these alleged deficiencies affected the verdict do not establish prejudice in light of the entire record. Since the appellant's allegations would not merit relief even if true, we find no abuse of discretion in the trial court's decision to deny the motion without a hearing.

For the foregoing reasons, the trial court's verdict and the motion judge's denial of the appellant's § 23–110 motion are

*Affirmed.*