*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 18-CO-289 & 20-CF-190

GLENN ARTHUR SMITH, JR., APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(2011-CF1-013068)

(Hon. Thomas J. Motley, Trial Judge)

(Argued April 28, 2022      Decided February 2, 2023)

*Sean R. Day* for appellant.

*Nicholas Coleman*, Assistant United States Attorney, for appellee. *Channing D. Phillips*, Acting United States Attorney at the time the brief was filed, *Elizabeth Trosman*, Assistant United States Attorney at the time the brief was filed, *John P. Mannarino*, *James Sweeney*, *Amy H. Zubrensky*, and *Elizabeth Gabriel*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, ALIKHAN, *Associate Judge*, and FISHER, *Senior Judge*.

ALIKHAN, *Associate Judge*: Appellant Glenn Arthur Smith, Jr., was convicted

of two counts of first-degree sexual abuse in violation of D.C. Code § 22-3002(a)(1),

and the trial court thereafter denied his request for a new trial under Super. Ct. Crim.

R. 33. Mr. Smith now appeals both his convictions and the trial court's denial of his Rule 33 motion. First, he argues that the trial court erred in rejecting his challenge, pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), to several of the government's peremptory strikes. Next, he contends that his trial attorneys were constitutionally ineffective in failing to prepare him to testify at trial and in declining to call the government's lead detective to the stand as part of the defense case. Finally, Mr. Smith asserts that, in deciding his Rule 33 motion, the trial court improperly considered a conversation between Mr. Smith and his trial counsel that had been captured by the court's audio recording system during post-conviction proceedings. We disagree on each count, and thus affirm Mr. Smith's convictions and the denial of his Rule 33 motion.

## I.     Factual Background and Procedural History

The underlying charges in this case arise from the following factual scenario, to which V.F., the victim of the alleged assault, testified at trial. In the early hours of June 13, 2010, V.F. left a party at the 4300 block of Garrison Street, NW, and walked toward Wisconsin Avenue to hail a taxi. Finding no available taxis, V.F. continued south on Wisconsin Avenue and, after walking for some time, turned into a wooded area behind a building to urinate. As V.F. stood up to leave the wooded area, a man grabbed her arm and put her in a chokehold. The man asked her how much money she had on her, and V.F. responded that she had only $15 and offered

him her purse.  He told her that "wasn't good enough" and that "he would just have to get something else from [her]," after which he pushed her down, pulled down her shorts and underwear, and forcibly penetrated her vagina several times.  The man threatened that he would "put his cock in [V.F.'s] mouth and that if [she] bit him, he was going to kill [her]."  After penetrating V.F. vaginally, the man told her that "it wasn't good enough" and forcibly penetrated her anally several times.  When the assault ended, the man took V.F.'s underwear, wiped her genitals with it, and ran off.

V.F. ran back to Wisconsin Avenue and hailed a taxi to a gas station, where she called the police.  V.F.'s 911 call from the gas station was admitted at trial, and Metropolitan Police Department Officer Shannon Williams testified that, when she arrived at the gas station, V.F. appeared "scared," "withdrawn," and "traumatized" and had dirt on her clothing, legs, and face.  Detectives took V.F. to the hospital, where she underwent a sexual assault examination.  The sexual assault nurse examiner testified at trial that, during the exam, she saw dirt and blood in V.F.'s perineal and anal areas and a tear in her anal wall.  Mr. Smith's semen was found on DNA swabs from V.F.'s thighs, external genitalia, and perineal and anorectal areas.

Although Mr. Smith indicated at an initial inquiry pursuant to *Boyd v. United States*, 586 A.2d 670 (D.C. 1991), that he had decided not to testify in his own

defense, he reversed course later in the day during a second *Boyd* inquiry. Mr. Smith took the stand and testified that, on the morning of June 13, 2010, he had seen V.F. on Wisconsin Avenue as he was driving home, and he had offered to wait with her for a taxi. He recounted that he and V.F. had started kissing and "caressing each other[']s bodies," and then engaged in consensual sex, during which his penis "slipped out," and he "accidentally penetrated [V.F.] anally." As a result, V.F. "scream[ed]," got "very upset," and accused him of assault, after which they argued and Mr. Smith eventually walked away and drove home. On cross-examination, the government confronted Mr. Smith with his July 2011 videotaped statement to the police, in which he told the interviewing detective that, around the time of the offense, he had not engaged in any late-night encounters with women he had just met and strongly denied any such encounter on the night in question. When the detective informed Mr. Smith in the interview that his DNA had been matched to V.F.'s alleged assault, he said, "[t]hat means I had sex with a girl and gave her money."

In late 2012, the jury found Mr. Smith guilty of both counts of first-degree sexual abuse.[1] Before sentencing, Mr. Smith filed several pro se motions for a new trial under Super. Ct. Crim. R. 33, alleging that his trial counsel had been

---

[1] Mr. Smith was acquitted of attempted robbery under D.C. Code § 22-2801.

constitutionally ineffective in failing to prepare him to testify at trial and in declining to call the government's lead detective to impeach V.F.'s trial testimony. The trial court appointed Mr. Smith new counsel and directed her to file a single, comprehensive motion for a new trial.

In 2014, while the motion for a new trial was pending, the trial court sentenced Mr. Smith to a 25-year term of incarceration and a 5-year term of supervised release on each count, to run concurrently, and ordered that he pay $200 to the Crime Victims Compensation Fund.

In 2018, after briefing and seven days of evidentiary hearings, the trial court denied Mr. Smith's request for a new trial. Mr. Smith timely appealed his convictions and the denial of Rule 33 relief.[2]

---

[2] Mr. Smith filed his initial appeal in 2018, No. 18-CO-289, and his appellate counsel filed a brief seeking a new trial. In 2020, new appellate counsel filed a second notice of appeal in order to challenge the underlying convictions, and the government waived any challenge to that appeal's timeliness. Because the timely 2018 notice of appeal was effective to challenge both Mr. Smith's convictions and the denial of his Rule 33 motion, *see* D.C. App. R. 4(b)(3)(A)(ii), Appeal No. 20-CF-190 was unnecessary and will be dismissed.

## II. Discussion

## A. *Batson* Challenge

We begin with Mr. Smith's *Batson* challenge, recognizing that he would be entitled to reversal of his convictions "if the record indicate[d] that race was a consideration in the prosecution's decision to strike even one black juror." *Harris v. United States*, 260 A.3d 663, 669 (D.C. 2021); *see Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019) ("In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many."). We conclude that the trial court did not clearly err in rejecting Mr. Smith's *Batson* challenge and thus decline to vacate Mr. Smith's convictions.

### 1. Jury Selection

Mr. Smith's *Batson* challenge relates to the first day of jury selection. After the court struck a series of jurors for cause, 37 prospective jurors remained, consisting of 31 white jurors, 4 Black jurors, one Hispanic juror, and one Asian juror. The government and the defense were each allotted ten peremptory strikes and one strike for selecting alternates. In total, defense counsel struck ten white jurors and passed on an eleventh strike. The prosecutor struck all six of the non-white jurors, including one Black juror who would have been an alternate. After the conclusion of peremptory strikes, defense counsel raised a *Batson* challenge, contending that the government had "eliminated every black person from the jury as well as Asian

and Hispanic." Although Mr. Smith's initial *Batson* challenge included the Asian and Hispanic jurors, the trial court queried whether the defense's prima facie case required "group[ing] the one Hispanic and the one Asian American" with the four struck Black jurors "to come up with six" struck jurors. In response, defense counsel acceded that the *Batson* challenge would stand "with just the four individuals" and stated that "[t]he number is four because that . . . was the number of . . . black individuals in this jury pool."[3]

The government contested Mr. Smith's prima facie case of discrimination, but nevertheless provided race-neutral reasons for striking the four Black jurors: Jurors 238, 254, 683, and 721. As to Juror 238, the prosecutor explained that "he was a plumber's assistant," and it was "concerned about the level of scientific evidence in

---

[3] Although Mr. Smith seeks to include all six non-white jurors in his *Batson* claim on appeal, we exclude Juror 802, the Hispanic juror, and Juror 565, the Asian juror, from our review. Defense counsel accepted the trial court's decision to narrow the *Batson* inquiry to the four Black jurors, and did not again object to the inquiry's narrowed focus, even after the prosecutor failed to provide race-neutral reasons for striking Jurors 802 and 565. As a result, any objection as to the exclusion of Jurors 802 and 565 has been forfeited. *See Smith v. United States*, 966 A.2d 367, 387-88 (D.C. 2009) (declining to revisit a strike that the prosecutor had not addressed because "defense counsel made no mention of this particular strike in renewing his challenge" or before the record was closed); *see also Safeway Stores, Inc. v. Buckmon*, 652 A.2d 597, 603 (D.C. 1994) (suggesting that a *Batson* claim could be forfeited if counsel "did not attempt to . . . object to continuing with [the] same jury" (citing *Hopson v. Fredericksen*, 961 F.2d 1374, 1377-78 (8th Cir. 1992)).

this case." The government had a "similar issue" with Juror 254's "profession," given that she was a "[c]ashier and breakfast attendant" and had only had "the cashier job . . . for 90 days." The prosecutor "also thought her dress was very disrespectful to the Court." With respect to Juror 683, the government explained that the strike was based on a "concern[]" that the juror had, during voir dire, mistakenly answered "yes" when the trial court asked him whether he, his immediate family, or his close personal friends had ever worked in local, state, or federal law enforcement.[4]

Lastly, the government explained that it had struck Juror 721, the alternate, because "that brought into the number one position" a preferred alternate, "who had a friend in the Maryland prosecution's office, worked in energy security, [and] had a Brown University affiliation." Although it maintained that there was no "race-based issue" with respect to Juror 721, the prosecutor offered to withdraw the strike. The court accepted the withdrawal, and defense counsel stated that he had no

---

[4] When asked by the trial court about his affirmative answer, Juror 683 explained: "It say either you or family work for state or local or state. That's what I answered." Juror 683 was employed by the D.C. Department of Public Works.

objection. Thereafter, the trial court set aside any concerns about Juror 721, explaining that "we're talking now [about] three people."[5]

Defense counsel disputed the government's explanation for striking Jurors 238 and 254, arguing that it boiled down to saying that "[Black individuals] were too unintelligent to serve on a jury," which was not "an effective reason to withstand that challenge." Counsel also returned to the prima facie case, asking the court to consider the "totality of the strikes" rather than "individually separat[ing]" the jurors.

After hearing the parties' arguments, the trial court found that Mr. Smith had not carried his burden of showing intentional discrimination under *Batson*. The court "question[ed] whether [defense counsel had established] a prima facie case" in the first instance, but it proceeded to consider the government's proffered race-neutral reasons for striking the three jurors and found them credible and reasonable. The court first considered Juror 683, explaining that the government "had a basis for striking that person" because he "got up here and did not understand [the voir dire

---

[5] Mr. Smith seeks to revive the challenge to Juror 721 on appeal, arguing that "the juror was reluctantly accepted and . . . the government knew that the alternate would likely not deliberate." However, because Juror 721 was ultimately seated as an alternate—and because the defense accepted the government's withdrawal of its strike against the juror without objection below—we decline to revisit whether the government acted with racial animus in initially striking Juror 721. *See Sydnor v. United States*, 129 A.3d 909, 913-14 (D.C. 2016) ("We have repeatedly held that a defendant may not take one position at trial and a contradictory position on appeal." (quoting *Brown v. United States*, 627 A.2d 499, 508 (D.C. 1993))).

question]." As to the "plumber's assistant" and "cashier," the court credited the government's representations and was satisfied that the strikes were not based on race.

## 2.     The Legal Framework

The Supreme Court has established a three-part framework for analyzing a claim of racial discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986). "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race," *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 328 (2003), by establishing that "the totality of the relevant facts gives rise to an inference of discriminatory purpose," *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 94). "At step one . . . 'the burden of establishing a prima facie showing is not onerous.'" *Beasley v. United States*, 219 A.3d 1011, 1014 (D.C. 2019) (quoting *Little v. United States*, 613 A.2d 880, 885 (D.C. 1992)).

Second, if the defendant makes that prima facie showing, the burden shifts to the government to offer a "race-neutral basis" for the strike. *Miller-El I*, 537 U.S. at 328. "At this second step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett*

*v. Elem*, 514 U.S. 765, 767-68 (1995) (brackets omitted) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion)).

Third, the trial court "must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers*, 139 S. Ct. at 2241. At the third step in the *Batson* inquiry, the trial court must carefully assess whether the defendant has carried his burden of proving "purposeful discrimination." *Smith v. United States*, 966 A.2d 367, 374 (D.C. 2009); *see Brown v. United States*, 128 A.3d 1007, 1012 (D.C. 2015) ("While the burden of producing evidence shifts during a *Batson* inquiry, 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" (quoting *Johnson v. United States*, 107 A.3d 1107, 1111 (D.C. 2015))). The "court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). Indeed, to ensure that "*Batson*'s promise of eliminating racial discrimination in jury selection will [not] be an empty one," *Smith*, 966 A.2d at 376 (quoting *Tursio v. United States*, 634 A.2d 1205, 1211 (D.C. 1993)), the third step of the *Batson* inquiry should be "a rigorous evaluation of the credibility of the prosecutor's explanations for h[er] challenged peremptory strikes," *Harris*, 260 A.3d at 674 (alteration in original) (quoting *Robinson v. United States*, 878 A.2d 1273, 1289 (D.C. 2005)). Even "'[g]reater

scrutiny' of the prosecutor's race-neutral explanations is required when the case is 'racially charged.'" *Id.* (quoting *Smith*, 966 A.2d at 376); *see Evans v. United States*, 682 A.2d 644, 650 (D.C. 1996) (explaining that "we apply closer scrutiny to a claim of race discrimination in the exercise of peremptory challenges in a case that is racially charged"). However, even where a case requires particularly careful scrutiny, the trial court is "not required to make detailed findings of fact or to give a detailed explanation following a *Batson* challenge." *Harris*, 260 A.3d at 680 (quoting *Johnson*, 107 A.3d at 1113).

Where—as here—"the trial court has ruled on the ultimate question of intentional discrimination" at *Batson*'s third step, "the preliminary issue of whether the defendant made a prima facie case [of discrimination] becomes moot" on appeal. *Id.* at 675 n.5. Accordingly, we focus our review on the trial court's conclusion as to intentional discrimination, considering "all of the circumstances that bear upon the issue of racial animosity." *Smith*, 966 A.2d at 375-76 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)); *see Flowers*, 139 S. Ct. at 2244 ("An appeals court looks at the same factors as the trial judge, but is necessarily doing so on a paper record."); *Harris*, 260 A.3d at 675 (explaining that we "must evaluate the government's proffered reasons for striking jurors in light of the entire record on appeal and in light of matters of common knowledge" (quoting *Smith*, 966 A.2d at 376)). Because a trial court's conclusions "largely will turn on evaluation of

credibility, a reviewing court ordinarily should give those findings great deference." *Harris*, 260 A.3d at 675 (quoting *Smith*, 966 A.2d at 377). "Thus, '[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.'" *Id.* (alteration in original) (quoting *Smith*, 966 A.2d at 377).

### 3.     Analysis

On appeal, Mr. Smith contends that the trial court failed to sufficiently scrutinize the government's proffered reasons for each of its peremptory strikes. In particular, he highlights the trial court's failure to engage in a "side-by-side comparison of black jurors in the venire who were struck and white jurors who were not struck," as well as the absence of any explanation by the trial court "for accepting the [prosecutor's] stated reasons." The absence of more rigorous scrutiny is particularly troubling, Mr. Smith contends, because this case is "racially charged" and because the government sought to strike all of the non-white jurors from the venire.

At the outset, we agree with Mr. Smith that the facts of this case, including its "racially charged" nature and the sequence of peremptory strikes by the government, required the trial court—and requires this court on appellate review—to carefully scrutinize the government's proffered race-neutral reasons. *See Evans*, 682 A.2d at 650; *Robinson*, 878 A.2d at 1287 (indicating that the court could not "ignore certain

salient facts about the case" that would strengthen "the inference that the prosecutor was motivated to strike black female jurors"). This court has contemplated more searching *Batson* inquiries where, for example, the case "involves a victim of one race and stricken jurors of a different race," *Smith*, 966 A.2d at 376, or where the success of a defense "turn[s] on whether the jury would find more credible the black witness or the white witnesses," *Tursio*, 634 A.2d at 1210. We have also required "more rigorous scrutiny" where the prima facie case of discrimination was especially strong, including where the government "eliminat[ed] . . . all non-black venirepersons from the jury." *Id.* at 1212.

In light of several of the above factors, we must carefully review the government's peremptory strikes here. This case involves a white victim, a Black defendant, and an (initial) attempt by the government to strike all of the Black jurors from the venire. Furthermore, the success of Mr. Smith's consent defense rested centrally on whether the jury would find the accounts of the white alleged victim or the Black defendant more credible. *See Tursio*, 634 A.2d at 1210. These factors carry particular weight for Black men charged with the crime of rape, given the sordid history of racism in rape prosecutions in particular. *See, e.g.*, Randall L. Kennedy, McCleskey v. Kemp*: Race, Capital Punishment, and the Supreme Court*, 101 Harv. L. Rev. 1388, 1411 (1988) (describing the history of disproportionate punishment for Black men accused of raping white women); Jeffrey J. Pokorak,

*Rape as a Badge of Slavery: The Legal History of, and Remedies for, Prosecutorial Race-of-Victim Charging Disparities*, 7 Nev. L.J. 1, 38 (2006) (discussing the effect of a rape victim's race on each stage of the criminal justice system's process); *cf. Huffman v. Wainwright*, 651 F.2d 347, 350 (5th Cir. 1981) (noting the particular importance of jury composition where the defendant, a Black man, was accused of raping a white woman); *State v. Henderson*, 764 P.2d 602, 603-04 (Or. Ct. App. 1988) (similar). Accordingly, the trial court was required—as are we on appellate review—to evaluate the government's explanations for each strike with heightened scrutiny. *Harris*, 260 A.3d at 676-77.

Before turning to the individual jurors, we pause to address one additional issue. In his brief, Mr. Smith presents statistics comparing the racial makeup of the jury to the District's census data, and he contends, citing *Beasley*, that the statistical evidence may "alone . . . establish discriminatory intent." As a threshold matter, we note that the relevant comparison is not between the jury and the District's total population, but between the jury and the pool of eligible jurors. At the time of the strikes, the jury pool consisted of 37 eligible jurors, of whom 31 were white, 4 were Black, and 1 each were Asian and Hispanic. Evaluating the proper pool, it is nevertheless quite concerning—especially in a racially charged case—that all non-white jurors were initially struck. This fact alone might have been sufficient to establish a prima facie case, *see Beasley*, 219 A.3d at 1015, and it looms large as we

evaluate the trial court's findings at the third step of the *Batson* analysis, *see Tursio*, 634 A.2d at 1212.

Considering Jurors 683, 238, and 254 in turn, we are satisfied that the trial court gave adequate scrutiny to the government's explanation for each strike. As noted, the government clarified that it had struck Juror 683 based on concerns that the juror had misunderstood and mistakenly answered a question at voir dire. Defense counsel offered no rebuttal to the government's reasoning, and the court proceeded to reject Mr. Smith's *Batson* challenge on the basis that the juror "got up here and did not understand [the voir dire question]." *Cf. Harris*, 260 A.3d at 678 (noting the importance of the trial court's "indicat[ing] . . . whether it recalled th[e relevant] interaction"). Because Mr. Smith bears the ultimate burden of establishing racial motivation, *Brown*, 128 A.3d at 1012, "we take particular note of the extent to which defense counsel rebutted the prosecutor's claims," *Smith*, 966 A.2d at 386. In the absence of meaningful rebuttal from Mr. Smith and in light of the court's observation that the juror had in fact not understood the voir dire question, we defer to the trial court's determination that the government's reason for striking Juror 683 was credible.

The government's strikes of Jurors 238 and 254 are more difficult, although we ultimately reach the same conclusion. The government explained both strikes by

reference to the jurors' professions, expressing a "concern[] about the level of scientific evidence in this case." Defense counsel briefly contested this point, arguing that the idea that Black jurors "were too unintelligent to serve on a jury" was not "an effective reason to withstand that challenge." After considering the government's proffered reasons and defense counsel's response, the trial court concluded that the government was "credible" and that it would accept its representation that the strikes were race-neutral.

The government's striking of Jurors 238 and 254 based on concerns about their intelligence is not in itself objectionable. *See, e.g.*, *Smith*, 966 A.2d at 381. But, evaluating these strikes "in light of the entire record on appeal and in light of matters of common knowledge," *id.* at 376, we note three relevant facts that may bear on the strikes' propriety. First, the prosecutor declined to ask Jurors 238 or 254 any questions at voir dire, thus foregoing an opportunity to ascertain their intelligence beyond the information provided by their employment histories. *See Flowers*, 139 S. Ct. at 2249 ("A 'State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.'" (quoting *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 246 (2005))). Next, it was evident before Mr. Smith's trial began that his primary defense would be one of consent—a concept that requires far less sophisticated scientific knowledge than, for example,

contesting the validity of a DNA match. *Cf. Smith*, 966 A.2d at 381 (noting that concerns about intelligence were warranted because the record indicated that jurors had to engage with complex concepts such as "constructive possession"). Finally, the prosecutor failed to raise a similar concern about the intelligence of Juror 916, a white woman, who stated during voir dire that she was a nanny. *See Miller-El II*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . at *Batson*'s third step.").

These factors, none of which Mr. Smith's counsel raised in the trial court, are nonetheless an insufficient basis for us to conclude that the trial court "clearly erred" in rejecting the *Batson* challenge to these two jurors. *Harris*, 260 A.3d at 677 (brackets omitted) (quoting *Snyder*, 552 U.S. at 477). The best evidence bearing on the question whether "counsel's race-neutral explanation for a peremptory challenge should be believed" is most often the "demeanor of the attorney who exercises the challenge"—a credibility assessment that lies "peculiarly within a trial judge's province." *Hernandez*, 500 U.S. at 365 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)). It is not implausible, in light of the facts of this case, that the government may have preferred a better-educated jury to compare the medical

testimony of the sexual assault nurse examiner with the testimony presented by Mr. Smith's expert physician.

Additionally, we are reticent to conclude that the trial court clearly erred in crediting the government's rationale when defense counsel made no real effort to rebut it. *See Smith*, 966 A.2d at 386. Because the burden of proof remained on Mr. Smith throughout the *Batson* inquiry, his counsel was required to "meaningfully [rebut] the prosecution's race-neutral reasons for striking" Jurors 238 and 254 by (1) "point[ing] out that the prosecutor's claims about the particular juror are false"; (2) "point[ing] out that although the prosecutor's claims about an excluded juror are true, similar claims can be made about non-excluded jurors who are not minorities, which should raise the suspicion of bad faith"; or (3) "argu[ing] that claims about the juror, although true, are so irrational as a reason for striking a juror that they might be pretexts for some undisclosed discriminatory reason." *Id.* at 387 (quoting *Robinson*, 878 A.2d at 1290). Mr. Smith's defense counsel did little of the foregoing. He neither defended the ability of Jurors 238 and 254 to hear scientific evidence nor sought to compare those jurors with the white nanny, to whom the government had no objection. At most, defense counsel offered a conclusory assertion that the prosecutor's reasoning was "[in]effective . . . to withstand [the *Batson*] challenge." *See id.* (holding that the defendant could not meet his burden of proof "by offering only 'conclusory assertions' that the prosecutor's reasons

appeared to be disingenuous" (quoting *Nelson v. United States*, 649 A.2d 301, 311 (D.C. 1994))). Without more from Mr. Smith's counsel to undermine the basis for the government's strikes, we cannot say that the trial court clearly erred in crediting the government's stated race-neutral reasons and thus in rejecting Mr. Smith's *Batson* challenge to the striking of Jurors 238 and 254.

## B.      Ineffective Assistance of Counsel

We turn next to Mr. Smith's claim that his counsel provided ineffective assistance. After his conviction, Mr. Smith filed a series of motions for a new trial, alleging that his trial attorneys rendered ineffective assistance of counsel in a variety of ways, two of which he continues to press on appeal. First, Mr. Smith alleged in an affidavit that his attorneys failed to prepare him to testify at trial. In particular, he contended that his attorneys failed to review possible questions with him, prepare him for cross-examination, explain appropriate trial demeanor to him, and review his videotaped statement to the police with him. Second, Mr. Smith alleged that his trial attorneys were ineffective in failing to call the government's lead detective, Detective Maupin, to the stand. Mr. Smith asserted that, if she had been called, Detective Maupin could have impeached V.F.'s trial testimony that Mr. Smith had threatened her life and that she had reported those threats to the police after the assault.

The trial court held a series of evidentiary hearings on the trial-preparation question, at which Mr. Smith and both of his attorneys testified.[6] At the conclusion of the hearings, the court credited the testimony of Mr. Smith's attorneys and concluded that their method of preparing Mr. Smith to testify was not constitutionally ineffective, even if it was "somewhat unstructured and informal." On the failure-to-impeach question, the trial court determined that there was no "unknown factual issue outside of the record" that necessitated a hearing. The court determined that the record itself, including the attorneys' own explanation of their strategic decisions, revealed that they were not deficient in failing to call Detective Maupin.

"For purposes of appellate review, the trial court's determination of whether counsel was ineffective presents a mixed question of both law and fact." *Jones v. United States*, 262 A.3d 1114, 1122 (D.C. 2021) (quoting *Turner v. United States*, 166 A.3d 949, 953 (D.C. 2017)).[7] "We must accept the trial court's factual findings

---

[6] The hearings also addressed Mr. Smith's allegation that his lawyers coerced him to testify at trial by telling him that he "had to testify" and that "without [his] testimony [they] would not be able to argue that [he] did not force [V.F.] to have sex with [him]." Mr. Smith does not press this argument on appeal.

[7] Although Mr. Smith presented his ineffective-assistance arguments in a pre-sentencing motion for new trial under Super. Ct. Crim. R. 33, we will evaluate it "as if it were a motion under D.C. Code § 23-110." *Johnson v. United States*, 585 A.2d 766, 769 (D.C. 1991).

unless they lack evidentiary support in the record, but we review the trial court's legal determinations," including on the ultimate question whether Mr. Smith's counsel was constitutionally ineffective, "de novo." *Id.* at 1122-23 (quoting *Turner*, 166 A.3d at 953). To establish ineffective assistance of counsel, Mr. Smith must demonstrate both that his trial counsel's representation was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On deficiency, Mr. Smith must show that his trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Clark v. United States*, 136 A.3d 334, 340 (D.C. 2016) (quoting *Strickland*, 466 U.S. at 687). This inquiry requires a careful assessment, free of "the distorting effects of hindsight," *Jones*, 262 A.3d at 1123 (quoting *Cosio v. United States*, 927 A.2d 1106, 1123 (D.C. 2007) (en banc)), as to whether "counsel's representation fell below an objective standard of reasonableness" and "prevailing professional norms," *id.* (quoting *Strickland*, 466 U.S. at 687-88). Even if counsel's performance was deficient, Mr. Smith must further establish prejudice—i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 1128 (quoting *Strickland*, 466 U.S. at 694); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (stating that a defendant must show "a 'substantial,' not just 'conceivable,' likelihood of a different result" (quoting *Harrington v. Richter*, 562

U.S. 86, 112 (2011))). Failure to show "either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

### 1. Preparation to Testify

In post-conviction proceedings, Mr. Smith averred that, in the run-up to trial, he had been consistent in his desire not to testify in his own defense. As a result, he explained, his attorneys, Daniel Gross and Kanita Williams, did not review possible direct or cross-examination questions with him, explain to him the appropriate demeanor for cross-examination, or review his videotaped statement to the police with him. Mr. Smith supported these assertions by reference to the notable absence of evidence documenting his counsel's preparation for his possible testimony; neither Mr. Gross nor Ms. Williams produced notes with sample direct and cross-examination questions or documents that recounted practicing such questions with Mr. Smith.[8] Three years after his initial post-conviction hearings, Mr. Smith also produced the computer-generated visitation records of CoreCivic, a company that managed the D.C. Correctional Treatment Facility ("CTF") where Mr. Smith had been housed during the relevant pre-trial period. Although CTF's physical sign-in records had been destroyed in the intervening years pursuant to CoreCivic's document retention policy, the computer-generated records appeared to show that

---

[8] Mr. Gross testified that "it wasn't [his] practice to take notes" documenting that kind of work.

Ms. Williams had visited CTF only twice, for 50 and 53 minutes—neither time long enough to watch Mr. Smith's entire interrogation video with him.

Mr. Gross and Ms. Williams testified, by contrast, that they had prepared Mr. Smith to testify throughout the course of their representation. Specifically, both attorneys explained that they had conducted multiple mock direct and cross-examinations, during which Mr. Gross had given Mr. Smith feedback on his word choice and on his tendency to affirmatively volunteer certain information. Mr. Gross testified that he had received a copy of Mr. Smith's videotaped statement to police from Mr. Smith, that the two had watched portions of the tape in his office before Mr. Smith was incarcerated, that Mr. Smith was "very familiar with the substance of the tape," and that they had discussed strategies for addressing the tape at trial. Mr. Gross also testified that, after Mr. Smith changed his mind about testifying during trial, he went through the "key points" of Mr. Smith's expected testimony with him and reiterated basic tips for cross-examination. For her part, Ms. Williams testified that she had shown Mr. Smith the entirety of his taped statement while he was incarcerated at CTF. And the government explained that the CTF records of Ms. Williams's visit history were unreliable and incomplete because they failed to show, for example, a November 2012 visit to which all parties had previously stipulated.

After considering the contradictions between Mr. Smith's testimony and that of his attorneys, the trial court credited the attorneys' testimony and concluded that they had reviewed Mr. Smith's story with him, discussed strategy and the use of appropriate language with him, and reviewed his videotaped statement with him.[9]

Generally speaking, "[w]e defer to a judge's reasonable 'credibility determinations' because such determinations are 'the appropriate function of the fact finder.'" *Jones*, 262 A.3d at 1123 (quoting *Gaulden v. United States*, 239 A.3d 592, 597 (D.C. 2020)); *see Byrd v. United States*, 614 A.2d 25, 30 (D.C. 1992) ("For obvious reasons, we tend to be more deferential to those findings by the trial judge which are facilitated by his presence in the courtroom and his ability to observe the players first hand . . . ."). In fact, "[a]ny 'factual finding anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous.'" *Stroman v. United States*, 878 A.2d 1241, 1244 (D.C. 2005) (quoting *Hill v. United States*, 664 A.2d 347, 353 n.10 (D.C. 1995)). Only where "[d]ocuments or objective evidence . . . contradict the witness' story" or where "the story itself [is] . . . so internally inconsistent or implausible on its face that a reasonable factfinder would not credit

---

[9] Although the court found the lack of documents corroborating the trial preparation "puzzling," it concluded that that fact alone did not discredit the attorneys' account.

it" is reversal warranted. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).

Mr. Smith has not shown that the trial court's credibility determinations were clearly erroneous. Ms. Williams corroborated Mr. Gross's testimony that he had met with Mr. Smith on multiple occasions to review his story, practice questioning, and provide him with feedback. The idea that Mr. Gross and Ms. Williams were going to prepare Mr. Smith for trial notwithstanding his initial decision not to testify is further underscored by Ms. Williams's notes from a November 1, 2012, meeting with Mr. Smith, which documented the attorneys' plan to prepare him to testify notwithstanding his decision not to do so. Although we agree with the trial court that it is "puzzling" that Mr. Gross neither took nor retained notes documenting his preparation for direct or cross-examination, Mr. Gross's explanation that "it wasn't [his] practice to take notes" during such mock examinations is not so "implausible on its face" that a reasonable factfinder could not credit it. *See id.* Nor do CoreCivic's seemingly incomplete visitation records squarely contradict the attorneys' testimony, especially Mr. Gross's testimony that he had reviewed the tape with Mr. Smith in his office while Mr. Smith was not incarcerated.

Accordingly, we affirm the trial court's decision to credit Mr. Gross and Ms. Williams and conclude that their trial preparation "fell within a wide range of

reasonable professional assistance." *Clark*, 136 A.3d at 341 (quoting *Chatmon v. United States*, 801 A.2d 92, 107 (D.C. 2002)). As we have explained, "me[eting] with [a defendant] several times prior to trial and ask[ing] a co-defendant's counsel to conduct a mock cross-examination of [the defendant]" is "well within the range of reasonable attorney performance." *Vaughn v. United States*, 93 A.3d 1237, 1272 (D.C. 2014); *see Mozee v. United States*, 963 A.2d 151, 165-166 (D.C. 2009) (rejecting a claim that trial counsel was constitutionally deficient based on allegations that he had "met with [defendant] only a few times before trial and did not prepare him for cross-examination on details such as the dates and places where he and the complainant had previously had consensual sex"). In light of the trial court's conclusion that Mr. Gross and Ms. Williams prepared Mr. Smith to testify and provided him with feedback throughout trial preparation, Mr. Smith has not met his burden to establish deficient representation.[10]

### 2. Failure to Call Detective Maupin

Mr. Smith further contends that his trial counsel was constitutionally ineffective in failing to call Detective Maupin to the stand, and that the trial court erred in denying this particular claim without a hearing. Detective Maupin, the lead detective on Mr. Smith's case, conducted an in-depth interview with V.F. on the

---

[10] Because we find no deficient performance, we need not address prejudice. *See Smith v. United States*, 203 A.3d 790, 796 (D.C. 2019).

night of the assault and documented the interview in an affidavit supporting the arrest warrant. Relying on her affidavit, Detective Maupin testified at Mr. Smith's preliminary hearing that V.F. had never discussed threats by her assailant during the interview. Detective Maupin's police reports also included no mention of any threats by V.F.'s assailant. At trial, V.F. testified that Mr. Smith had threatened to kill her during the assault, and that after the threat, she "just tried to be still because [she] didn't want to aggravate him more." Although Mr. Smith's trial attorney confronted V.F. about this inconsistency on cross-examination—asking, "[Y]ou never told that to any of the police officers, did you?"—he did not call Detective Maupin to the stand, even after V.F. testified that she had in fact reported her assailant's threats to the police.

When Mr. Smith first raised alarm about his counsel's failure to impeach V.F. concerning the allegation of threats, he focused on his attorney's decision not to introduce Detective Maupin's police reports. Mr. Gross responded that "all the decisions were made based upon [his] best professional judgment" and that the documents Mr. Smith wanted to introduce "contain[ed] information that would be harmful to his case." Ms. Williams corroborated this account at the post-conviction hearings, explaining that "[Mr. Gross] did not agree with th[e] strategy" of calling Detective Maupin and introducing the relevant police reports. Ms. Williams explained that she and Mr. Gross had decided that "the discrepancies [in V.F.'s

testimony] were so minor in light of [her reported] trauma" and that it would be particularly harmful to have the jury review V.F.'s detailed account of her assault, which was contained in the reports. Relying on the testimony of Mr. Gross and Ms. Williams, the trial court concluded that no separate hearing on this question was necessary and that "the facts and circumstances of this case offer an explanation as to why Attorney Gross made the decision not to call . . . Maupin to impeach the complainant." In particular, the court noted that although Mr. Gross's explanation was specifically about the police reports, the same rationale applied to not calling Detective Maupin as a witness.

We review the trial court's decision to deny this part of Mr. Smith's motion "without a hearing for abuse of discretion." *Bethea v. United States*, 170 A.3d 192, 194 (D.C. 2017). When a defendant raises a claim of ineffective assistance of counsel, "there is a presumption that the trial court should conduct a hearing." *Steward v. United States*, 927 A.2d 1081, 1087 (D.C. 2007) (quoting *Jones v. United States*, 918 A.2d 389, 402-03 (D.C. 2007)). But we have explained that a hearing is not necessary where "the claims (1) are palpably incredible; (2) are vague and conclusory; or (3) even if true, do not entitle the movant to relief." *Bellinger v. United States*, 127 A.3d 505, 515 (D.C. 2015) (quoting *Newman v. United States*, 705 A.2d 246, 261 (D.C. 1997)). "Under the last of those three categories, 'if no genuine doubt exists about the facts that are material to the motion, the court may

conclude that no evidentiary hearing is necessary.'" *Id.* (quoting *Ginyard v. United States*, 816 A.2d 21, 38 (D.C. 2003)).

The trial court did not abuse its discretion in denying Mr. Smith's claim without a hearing because "the record by itself [was] sufficient to establish that counsel's decision" not to call Detective Maupin "was a reasonable tactical choice." *Reaves v. United States*, 694 A.2d 52, 58-59 (D.C. 1997); *see Perez v. United States*, 968 A.2d 39, 85 (D.C. 2009) ("[T]he decision to call witnesses is a judgment 'left almost exclusively to counsel.'" (alteration in original) (quoting *Smith v. United States*, 454 A.2d 822, 825 (D.C. 1983))). Resolving an ineffective-assistance claim on the basis of the record alone is especially feasible where, as here, "the judge ruling on the motion is the same judge who conducted the trial." *Reaves*, 694 A.2d at 58. That is "because 'the trial judge, who has seen the defense attorney in action and watched the evidence unfold, is in [the best] . . . situation . . . to determine whether there is any appreciable possibility that a hearing could establish . . . constitutionally defective representation.'" *Id.* (alterations in original) (quoting *Sykes v. United States*, 585 A.2d 1335, 1340 (D.C. 1991)).

Unlike in *Parker v. United States*, 249 A.3d 388 (D.C. 2021), where we determined that a trial judge erred in deeming the trial counsel's decisions "strategic" without any evidence in the record indicating that counsel chose to act "for tactical

reasons," *id.* at 411, the record here includes sworn testimony from Mr. Smith's attorneys explaining their strategic reasons for not further impeaching V.F. based on her police interviews. And while Mr. Gross's strategic explanation focused on his reasons for not introducing the police reports, Ms. Williams confirmed in post-conviction proceedings that she and Mr. Gross had followed the same reasoning in deciding not to call Detective Maupin to the stand. Either method of impeachment would, as Ms. Williams explained, re-emphasize V.F.'s detailed description of the assault for the jury while revealing at most "minor" discrepancies between her accounts.

Lastly, to the extent that Mr. Smith requested a hearing below, he did so only on the basis that his attorneys' decisions were legally improper, not that they were factually contested. "Having now learned trial counsel's rationale," Mr. Smith wrote in a motion to broaden the scope of the evidentiary hearing, "it is clear that there is no legally defensible position for the decision." But where a litigant challenges merely the "soundness," rather than "the truth[fulness] of [his counsel's] reasons" for making certain decisions at trial, the court can reasonably resolve the ineffectiveness claim without a hearing. *Ginyard*, 816 A.2d at 38; *see id.* (explaining that the "soundness" of counsel's actions "present[s] a question of law rather than of fact"). Thus, the trial court did not abuse its discretion in denying this ineffective-assistance claim without a hearing. *See id.*

While we do not need to address prejudice in light of our conclusion above, *see supra* n.10, we note briefly that even if Mr. Smith's attorneys had been deficient in failing to call Detective Maupin, this deficiency was not prejudicial. As we have previously explained, "[a] deficient performance by counsel may not always prejudice a defendant if the 'main thrust' of counsel's argument is still presented to the jury." *Jones*, 262 A.3d at 1128-29 (quoting *Curry v. United States*, 498 A.2d 534, 543 (D.C. 1985)). Here, notwithstanding the absence of Detective Maupin's testimony, Mr. Smith's trial counsel pressed V.F. on the relevant inconsistency on cross-examination and presented it to the jury at closing argument, explaining that V.F. had never told her doctors, nurses, or the police about "the threats to kill." The mere notion that calling Detective Maupin to the stand could have further underscored this argument simply cannot give rise to a "reasonable probability that . . . the result of the proceeding would have been different" had she been called. *Id.* at 1128 (quoting *Strickland*, 466 U.S. at 694).

## C.    Courtroom Recording

Finally, we address Mr. Smith's contention that the trial court erred in listening to and considering a discussion between Mr. Smith and his trial counsel that had been captured on the Superior Court's audio recording system. The issue of this audio recording first arose at a February 9, 2015, status hearing, during which the trial court informed the parties that a law clerk had listened to the Superior

Court's audio recording system to ascertain the length of a break in the trial proceedings before the court's second *Boyd* inquiry—information that was not evident from the trial transcripts themselves and was arguably relevant to Mr. Smith's ineffective-assistance claim. After listening to the recording, the clerk reported to the court that information "relevant" to the ineffective-assistance inquiry may have been captured on the tape. The court ordered the clerk not to disclose the contents of the tape in case it contained attorney-client communications, but it authorized Mr. Smith and his counsel to listen to the relevant portion of the recording. After listening to the recording, Mr. Smith's counsel initially argued that the tape had to be excluded because it was not part of the official trial record and because it had been discovered through an improper ex-parte judicial investigation. However, counsel later advised the court that she did not object to the government's hearing the audio recording; that she thought "the Court should listen to [the tape] and make it a part of the record"; and that attorney-client privilege had been waived because the recording was relevant to Mr. Smith's ineffective-assistance claim.[11] Only then did the trial court listen to the tape—which captured trial counsel's portion

---

[11] Mr. Smith's counsel explained: "I don't disagree that the privilege has been waived once there is a claim of . . . ineffective assistance of counsel with respect to this particular issue." The trial court later clarified that "at this moment in time [Mr. Smith] is still waiving [the attorney-client privilege]; is that correct?" to which his counsel responded, "That's correct."

of a discussion with Mr. Smith about his decision to testify at trial—and determine that its contents had "evidentiary value." Ultimately, the trial court relied on the recording to conclude that Mr. Smith had given false testimony at the post-conviction hearing—a factor that led the trial court to discredit Mr. Smith's testimony.

On appeal, Mr. Smith contends that the trial court erred in improperly investigating the courtroom audio recording system and in considering the communications captured thereon. In particular, he argues that the communication was protected by attorney-client privilege and that the recording was uncovered by an improper judicial investigation. At the outset, we note that Mr. Smith's position on appeal contradicts both his concession below that the attorney-client privilege had been waived, and his request that the trial court listen to the tape and make it part of the record. "A party may not take one position in the trial court, and another on appeal," *McCoy v. United States*, 760 A.2d 164, 182 n.22 (D.C. 2000), and we typically "preclude[] a party from asserting as error on appeal a course that he or she has induced the trial court to take," *Preacher v. United States*, 934 A.2d 363, 368 (D.C. 2007).

Nevertheless, we conclude that the trial court did not err in taking judicial notice of the courtroom's audio recording system. Although a judge may not initiate

an independent investigation of facts, *In re T.S.*, 829 A.2d 937, 941 (D.C. 2003),

"[i]t has long been settled that a court may take judicial notice of its *own* records,"

*Daniels v. United States*, 33 A.3d 324, 330 (D.C. 2011) (emphasis added) (quoting

*Washington v. United States*, 760 A.2d 187, 194 (D.C. 2000)).  Much like the

CourtView records that the trial court properly considered in *Daniels*, the recording

that mistakenly captured trial counsel's conversation with Mr. Smith was part of the

Superior Court's official records.  *See* Super. Ct. Crim. R. 36-I(a) ("All proceedings

must be recorded by a court reporter or by a suitable recording device.").  Nothing

before us suggests that the law clerk's review of the audio captured on the court's

recording device is remotely akin to ex parte judicial investigations we have

previously deemed improper, including where a judge "initiated an investigation to

determine whether [an individual] had been fed while in custody," *In re T.S.*, 829

A.2d at 940, or "ma[d]e a telephone call to find out whether appellant had a driver's

license," *Davis v. United States*, 567 A.2d 36, 38 (D.C. 1989); *see Foster v. United*

*States*, 615 A.2d 213, 216-19 (D.C. 1992) (concluding that a trial judge had

conducted an improper judicial investigation where he initiated ex parte

communications with the Parole Board to resolve an inconsistency between two

relevant reports).

Additionally, the trial court promptly disclosed the existence of the recording

to the parties—without listening to it—and permitted Mr. Smith to determine how

to proceed. It was only after Mr. Smith recommended that the court listen to the recording and make it part of the record that the court did so. *See, e.g.*, *Harrison v. United States*, 76 A.3d 826, 833 (D.C. 2013) (indicating that the court acted "fair[ly]" when it "disclosed the facts that were being noticed, explained why, and gave appellant an opportunity to contest those facts"); *Bradley v. District of Columbia*, 107 A.3d 586, 589 (D.C. 2015) (explaining the importance of disclosing any consideration of extra-record information to the parties and "mak[ing] those documents part of the record").

Finally, the information captured on the court's recording device was not protected by attorney-client privilege. Mr. Smith waived that privilege when he requested at the post-conviction hearing, via counsel, that the court should listen to the tape and make it part of the record. *See Adams v. Franklin*, 924 A.2d 993, 999 (D.C. 2007) ("When a party authorizes disclosure of otherwise privileged materials, the privilege must be treated as waived."). Accordingly, we reject Mr. Smith's argument that the trial court erred in investigating and considering the court's own recording during the post-conviction proceeding.

### III. Conclusion

For the foregoing reasons, Mr. Smith's convictions are affirmed, the Superior Court's decision denying Mr. Smith's request for a new trial is affirmed, and Appeal No. 20-CF-190 is dismissed.

*So ordered*.